[Crim. No. 1163. In Bank.—April 7, 1905.]

THE PEOPLE, Respondent, v. CHIN NON, Appellant.

CRIMINAL LAW—CHINESE MURDER CASE—IDENTITY OF DEFENDANT IN DOUBT—CONFLICTING EVIDENCE — MISCONDUCT OF JURY — READING NEWSPAPER ARTICLES.—Upon the trial of one of five Chinamen jointly accused of murder, where the identity of the defendant was in doubt, and the testimony of rival Chinese tongs was such that deliberate perjury must have existed on one side or the other, it was prejudicial misconduct for jurors to have read newspaper articles stating that the district attorney had arrested for perjury a witness for the defense who testified that an identifying witness was elsewhere when the murder was committed, and that a police- man, who testified to the same effect, would have to battle to keep

CXLVI. Cal.—36

out of the penitentiary if information said to be in possession of the district attorney was correct.

ID.—PROOF OF MISCONDUCT—AFFIDAVITS OF JURORS—ACTION OF DISTRICT ATTORNEY—ADMISSION.—Though the defendant cannot prove misconduct of the jury, either by affidavits upon information and belief, or by positive affidavits of jurors, to impeach the verdict against him, the reason of the rule as to affidavits of jurors does not apply where such affidavits showing misconduct of the jury were produced by the district attorney to show the facts, and to excuse them, as far as he could. The misconduct being thus in effect admitted by the district attorney, requires the granting of a new trial.

APPEAL from a judgment of the Superior Court of Sacramento County and from an order denying a new trial. E. C. Hart, Judge.

The facts are stated in the opinion of the court.

Charles T. Jones, and Hiram W. Johnson, for Appellant.

U. S. Webb, Attorney-General, and C. N. Post, Assistant Attorney-General, for Respondent.

BEATTY, C. J.—The defendant is one of five Chinamen who were jointly accused of the murder of Jeong Him. One of his co-defendants—Sing Yow—was first tried, convicted, and sentenced to death, and the opinion of this court affirming that judgment will be found reported in 145 Cal. 1. This defendant was afterwards convicted on the same charge, and his appeal is based in part upon assignments of error which were held insufficient in the former case. As to those matters nothing further need be said here. The remaining points, so far as they require discussion, will be made clearer by a preliminary statement of the case in its more general aspects.

The homicide occurred in the town of Walnut Grove on the Sacramento River, a place containing a population of several hundred Chinese. About nine o'clock in the morning Jeong Him came out of the Chinese restaurant where he had been eating breakfast. As soon as he appeared on the street three Chinamen who had been waiting there opened fire upon him with their pistols. He fled, apparently wounded, through a part of Chinatown and down the bank of the river, closely pursued by two or three Chinamen, who soon came up with him at

a point where he had fallen and fired five or six shots into his prostrate body. All the witnesses, white and Chinese alike, testify to these facts, making it a clear case of deliberate murder. But as to the identity of the murderers the case is far from clear. Not one of the white witnesses recognized this defendant or either of his co-defendants as one of the two or three Chinamen who pursued the deceased to the point where he fell and was shot to death. A number of Chinese witnesses, however, positively identified this defendant and two of his co-defendants as those who were in at the death and two others as among those who fired at deceased as he left the restaurant. On the other hand, about an equal number of Chinese witnesses swore just as positively that only two men joined in the pursuit (on which point they were corroborated by some of the white witnesses), that they knew those men as well as the defendants, and that it was not the defendants but others, whose names they gave, who followed and killed the deceased. Other Chinese witnesses testified that at the very time of the murder this defendant and some of his co-defendants were at places remote from the scene of the homicide. In short, the case presents all the family features of the ordinary Chinese murder case in which one tong is prosecuting and another defending—features with which the courts of this state have become so painfully familiar. We have one set of witnesses testifying to one state of facts and another set, in about equal numbers, contradicting them point-blank under circumstances which prove to a demonstration that deliberate perjury has been committed on one side or the other, but which furnish very insufficient *criteria* for determining where the truth lies. It is apparent that in such a case any unwarranted action by the court or unauthorized communication to the jury having a tendency to convince them, or to arouse a violent suspicion, that any of the witnesses for the defense were swearing falsely must be highly if not fatally prejudicial.

It happened in this case that one Lee Bin, a former resident of Fresno, was one of the principal witnesses for the prosecution, to prove the identity of the murderers. For the defense witnesses were called to prove that on and after the day of the homicide Lee Bin was still in Fresno.

One of these witnesses was Lee Sam, a Chinaman, and another was E. B. Bradley, a police officer of Fresno. The

last-named witness testified to seeing Lee Bin in Fresno subsequent to the date at which he swore he had left that city, and his testimony tended to prove that he was still in Fresno at the date of the homicide. Lee Sam testified even more positively to the same effect. As soon as Lee Sam left the witness stand he was by direction of the district attorney arrested in the hall of the courthouse and just outside of the courtroom. It is not clear that the arrest was witnessed by any of the jurors, but it does appear that they or some of them were informed of the arrest almost immediately after it occurred, and that the arrest was made on a charge of perjury. The next morning, and while the trial was still in progress, the following article appeared in the Record-Union, a daily newspaper published at Sacramento, where the cause was on trial:—

## "CHINESE WITNESS ARRESTED.

"LEE SAM ACCUSED OF PERJURY IN MURDER TRIAL.

"The trial of Ting Non, charged with the murder of Jeong Him in Walnut Grove the twenty-first of last month, rises above the dead level of generalities. It is a stupendous battle between rival tongs, and upon comparing the testimony given by the witnesses of one side with that given by those of the other, it is apparent that somebody has got wrong on facts The trial is replete with incidents. Last Wednesday one of the bosses interested in the defense was barred from the courtroom and cited to appear to show cause why he should not be punished for contempt. His offence consisted in signaling to witnesses on the stand, apparently coaching them as to their answers to questions, and Judge Hart caught him in the act.

"Lee Sam was a witness for the defense yesterday morning, and his testimony got him into trouble. He now occupies a cell in the County Jail with a charge of perjury hanging over him.

"Lee Sam's testimony was intended to impeach Lee Bin, one of the chief witnesses for the prosecution. Bin testified that he was in Walnut Grove at the time of the shooting, and his testimony was considered to be strong. According to his testimony he left Fresno November 5th last for San Francisco, and that he subsequently went to Walnut Grove and was present when the shooting was done. Sam yesterday testified that Bin was in Fresno from the 1st to the 28th of February last,

inclusive, and was not in Walnut Grove at all.  He was emphatic in his statement, and as the district attorney has evidence that he deems conclusive that shows Bin left Fresno November 5th, and was in Walnut Grove at the time of the shooting, he acted promptly.

"Assistant District Attorney Yell quietly left the courtroom and when Sam stepped down from the witness-chair and walked out into the corridor he was arrested and locked up on a charge of perjury.

"To a Record-Union reporter District Attorney Seymour said: 'We do not desire to do a thing that would influence anybody regarding the trial one way or the other, but they are carrying this thing too far, and it has got to stop.'  With the evidence on hand it is the intention of the district attorney's office to prosecute Sam to a finish after the Chinese murder cases shall have been disposed of. . . . ''

And while the cause was still on trial, the News, a weekly paper published in Sacramento, appeared with the following:—

### "A POLICEMAN'S PERIL.

"Policeman John Bradley of Fresno will have to battle to keep out of the penitentiary if information said to be in possession of District Attorney Seymour is correct.  Bradley is a witness for the defense in the trial of a Chinese for murder in the Superior Court here.  He swore that between November 5th and 15th Lee Bin was in Fresno.  Bin is a main witness for the people and declares that he witnessed the murder at Walnut Grove on November 5th, when Bradley claims to have seen him in Fresno.

"The district attorney is understood to have learned that Bin withdrew his deposit in the First National Bank in Fresno before the date named by Bradley, and that the coolie left Fresno on the same day.

"Already one witness for the defense, a Chinese, has been arrested for perjury, and is now in the county jail."

Both of these articles were read during the trial by several of the jurors.  Of this fact there can be no doubt, because we have in the record the affidavits of the jurors themselves, admitting that they read one or both of the articles, but claiming that they made no impression on their minds and did not in the least influence them in arriving at their verdict, etc.

The reading of these articles by the jurors was grave misconduct, and, under the peculiar circumstances of this case, must have prejudiced the defense. (*People* v. *Stokes*, 103 Cal. 196.[1]) And the misconduct being admitted, the jurors cannot be heard to deny its prejudicial influence. (*People* v. *Stokes*, 103 Cal. 196, and *People* v. *Azoff*, 105 Cal. 634.)

The only question arising in this connection is one not raised by the attorney-general, but suggested in the discussion here. The sole evidence offered by defendant to prove that the jurors read the newspaper articles consisted of affidavits based on information and belief, and it has been held that such affidavits are not competent evidence to support charges of misconduct. The only positive evidence of the misconduct here alleged is supplied by the affidavits of the jurors themselves, and it has been many times decided upon grounds of public policy. that a juror cannot be allowed to impeach his own verdict by evidence of misconduct on the part of himself or his fellows. But these decisions were all made in cases in which the evidence was offered by the party against whom the verdict was given, and the considerations of public policy upon which they were based have no application where the evidence is offered by the party who gained by the verdict and is seeking to sustain it. Such a case is not within the reason of the rule and does not involve the mischief to be prevented. Especially in a criminal case it is not to be supposed that the district attorney—a sworn public officer charged by law with the duty of protecting the interests of the people—will exert any influence upon jurors to elicit evidence that will impeach a verdict for the people.

And this also is to be considered. It is not the duty of the district attorney to sustain a verdict for the people by denying or suppressing any fact which he knows to exist. Here the district attorney seems to have ascertained by inquiry among the jurors that they had read the objectional publications. Being convinced of the fact, he chose, and, in my opinion, properly chose, to waive the technical rule by which he might have excluded the evidence offered on the part of the defendant, and thereby suppress what he knew to be the truth. Instead of this he produced the affidavits of the jurors themselves, by which he in effect admitted the facts and sought to

[1] 42 Am. St. Rep. 102.

excuse them, so far as he could. To such a case the rule against allowing jurors to impeach their own verdict ought not to be applied. In Missouri it has been held that the affidavit of a juror impeaching the verdict, if admitted without objection when offered by the losing party, must be considered. (*Winn* v. *Reed,* 61 Mo. App. 625.) *A fortiori* it must be considered when offered by the prevailing party. For the misconduct of the jurors the judgment and order of the superior court must be reversed.

Of the numerous rulings of the court upon which errors are assigned, we find only two or three requiring comment. We think the court should have allowed a fuller cross-examination of the witnesses for the prosecution on the subject of their relations to and dependence upon the Bing Kong Tong. And we think the circumstances as shown by this record hardly warranted the trial judge in citing the defendant's interpreter in the presence of the jury to answer a charge that he had been signaling to the witnesses for the defense while they were testifying.

Judgment and order reversed and cause remanded.

Van Dyke, J., Lorigan, J., Shaw, J., and Angellotti, J., concurred.

Henshaw, J., dissented.