[Crim. No. 704.    Third Appellate District.—September 28, 1923.]

THE PEOPLE, Respondent, v. ULY EVANS, Appellant.

[1] EVIDENCE — IMPEACHMENT OF VERDICT BY JUROR — COMPETENCY—WAIVER.—While a juror is not a competent witness to impeach his own verdict, except in case of a resort to chance, his competency may be waived and must be held to have been waived by failure to object.

[2] CRIMINAL LAW—HOMICIDE—EVIDENCE—AFFIDAVIT OF JUROR—COMPETENCY—WAIVER.—In a prosecution of a special policeman for the killing of another, evidence contained in an affidavit of a juror produced on motion for new trial to the effect that during the deliberations of the jury a certain juror stated "that defendant was a crack shot; that he went out in the mountains hunting every summer and that he, the defendant, could shoot the buttons off a person's coat one after the other, and argued that being so he could have shot the deceased in the foot or arm and not where he did shoot him," was competent; and failure to object on the ground of incompetency of a witness who gives competent testimony is a waiver of such incompetency.

[3] ID.—EVIDENCE—NEW TRIAL.—In such prosecution, a careful consideration of the whole case, including the evidence, leads to the conclusion that the defendant is entitled to a new trial.

APPEAL from a judgment of the Superior Court of Humboldt County and from an order denying a new trial. E. P. McDaniel, Judge Presiding.    Reversed.

The facts are stated in the opinion of the court.

Puter & Quinn for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

FINCH, P. J.—The defendant was charged with murder and convicted of the crime of manslaughter. He prosecutes this appeal from the judgment of conviction and the order denying his motion for a new trial.

At the time of the homicide the defendant was a special policeman of Eureka and had served in that capacity continuously for a period of more than seventeen years. The deceased, Oscar Roberts, was an Indian. He and his brother James Roberts had been drinking intoxicating liquors during the evening and were intoxicated. Shortly before the homicide they engaged in two altercations with a white man who, in each instance, knocked the deceased down. The white man testified that when the Indians approached him the second time the deceased "had his hand behind his back as if he had something, a knife or gun or something."

James Roberts testified that he and the deceased left the scene of the second encounter and walked down the street to an alley, into which they turned; that while passing along the alley they looked back and saw a man behind them; that they then walked faster and, as they were about to emerge from the alley at the opposite end from that at which they entered, the deceased was shot and fell upon the sidewalk; and that neither the witness nor his brother had any trouble with defendant prior to the shooting. Another witness for the prosecution testified that he saw defendant follow the two Indians into the alley and four or five minutes later heard two pistol shots. A third witness said he saw the defendant stagger and fall in the alley; that two white men helped defendant to arise; that while defendant was getting up the witness saw two Indians walking rapidly down the alley; that a few seconds later he heard three pistol shots and then went to the scene of the shooting; and that the defendant there said: "I got one of the sons-of-bitches and I will get some more of them." Other witnesses testified as to the use of similar language by the defendant and some of them said he was under the influence of intoxicating liquor, but not drunk. Some of these wit-

nesses admitted they were not friendly with defendant, one
of them saying: "We do not speak."

Two witnesses for defendant, Everett Dale and John
Henderson, testified that they saw the Indians knock the de-
fendant down in the alley and then walk rapidly away;
that these witnesses helped the defendant to arise and then
followed the Indians; that they met the Indians on the
street after leaving the alley and that the deceased "pulled
off his coat and wanted to fight"; that the Indian said "they
would go back to the alley and get that fellow," and then
started back toward the alley; and that shortly thereafter
they heard three shots. Another witness testified that after
the homicide James Roberts stated that when he and the
deceased went down the alley they were hunting for the
man who had knocked the deceased down; that they found
a man in the alley but "it was the wrong man" and they
ran; and that they were both drinking so much that they
"had to fight with somebody."

The defendant testified that while passing through the
alley in discharge of his duties the Indians attacked him;
that after getting him down they hit and kicked him; that
one of them then said: "Let's beat it, there is somebody
coming in the alley. . . . We will get you later; we will get
you"; that two white men helped defendant arise and one
of them said: "Those Indians have jumped three or four
people before this"; that as he was about to emerge from the
alley he saw the two Indians again and that deceased said:
"There is the son-of-a-bitch now," and started for defend-
ant; that defendant then drew his pistol and warned the
Indians to stay away, but that they came on and threatened
to kill him; that deceased was crouched down and had one
hand under his coat; that defendant backed away from
them, but they followed him; that he then fired one shot at
the feet of deceased and another in front of James to keep
them away; and that when deceased continued to approach
defendant and threatened to kill him the latter fired, inflict-
ing the fatal wound. A few hours after the homicide, in
answer to questions propounded by the district attorney,
the defendant made a statement of the facts leading up to
the shooting. In the main the statement so made agrees
with defendant's testimony given at the trial, but in some
material respects it is inconsistent therewith. There are

also material discrepancies between the testimony given at the coroner's inquest or the preliminary examination and that given at the trial by some of the principal witnesses for the prosecution. As having some bearing upon the defendant's situation at the time of the homicide, it may be stated that he has a permanently stiff knee which naturally interferes with his activity.

An examination of the whole evidence leads to the belief that the learned judge, who presided with eminent fairness and impartiality at the trial, had ground for making the following statement at the time of pronouncing sentence: "In this case the evidence seemed to me conclusive that the defendant acted in belief that the men who had knocked him down shortly before . . . had assaulted him. He was knocked down by them and they ran away, and he found it extremely difficult to get up from this position on account of his leg. . . . I cannot see how the jury could have rejected the testimony of Henderson and Dale that those Indians, after coming on to C Street, returned then to the alley to 'get' him. That was the crucial point in the case. There is no doubt in my mind that the drunken Indians, unarmed, however, and so drunk that they were easily handled as demonstrated by the first trouble—that was not known to the defendant Evans, however—that they thought that the same man who knocked Oscar Roberts down on D Street was coming down the alley. Then it was that the shooting took place and the shots were fired in rapid succession. Now, the defendant's story at the trial seemed to fit the circumstantial evidence in the case so well . . . as to make a story, if believed, that would have excused or justified most men in his situation, in a dark alley after night and who had a short time before been attacked and thrown to the ground. . . . The court believes there was enough room for some doubt in this case so strongly that I can even say if I had been on the jury, not knowing any more about the case or the people involved, that perhaps my verdict would have been not guilty upon the ground of reasonable doubt; but I have no right to substitute my opinion, if that was my opinion, for the jury's." The court also referred to contradictions and inconsistencies in the defendant's testimony as indicating that it was "not exactly truthful" and may have caused the jury to reject it and intimated that the

defendant may have resorted to the use of a deadly weapon
too hastily and without any immediate necessity therefor.
The evidence is sufficient to sustain the verdict and judg-
ment. The foregoing outline of the case is given because
of its bearing upon the question whether the matters here-
inafter stated resulted in a miscarriage of justice.

During the progress of the trial a stenographer of the
district attorney's office, who took the defendant's statement
hereinbefore referred to in shorthand and thereafter tran-
scribed the same, was sworn as a witness and asked to state
what the defendant said on that occasion. By consent of
the attorneys for both parties the transcribed statement was
admitted in evidence as the testimony of the stenographer.
Appended to the transcribed notes of the stenographer were
certain questions propounded by persons other than the dis-
trict attorney, and in the latter's absence, and the defend-
ant's answers thereto, relating to the arrest of James Roberts
immediately after the homicide. Such appended matter was
not admitted in evidence and neither the court nor the
attorneys for defendant knew until after the verdict was
rendered that the same was attached to the statement. The
questions and answers so appended are as follows: ''Q. Mr.
Evans, you arrested this man [James Roberts] here, didn't
you? A. Yes, I went out of the alley and found him on
Second Street and I told him to come along. Q. You
brought him? A. Well, we started and he came along all
right until we got to Third Street this side of E and he
started to raise a little rough house, grappled with me and
tore me as you see here, my sleeve and shirt, knocked my
glasses off, and I have not found them yet and suppose
they are down there, *and he started to run up Third Street
by the Woolworth store and I shot at him. . . .*'' Neither
the italicized words nor the facts which they narrate were
at any time referred to during the taking of testimony.
During their deliberations the jurors came into court and re-
quested that the defendant's aforesaid statement which had
been admitted in evidence be read to them. The parties
consented that the statement be delivered to the jury for
their perusal and the same was taken to the jury-room by
them, neither the court nor the attorneys for defendant
knowing of the appended matter. Such matter was read
by at least some of the jurors. Unquestionably the

attorneys for defendant were negligent in failing to examine the transcript before its admission in evidence and in consenting that it be taken to the jury-room without knowing its contents. It may be said, however, that the leading counsel for the defendant was temporarily absent when the statement was admitted in evidence and also when it was given to the jury and the associate counsel was not in attendance during all of the trial. The trial court, in referring to the matter said: "I do not blame counsel for the inadvertence."

In addition to the foregoing, in support of his motion for a new trial, the defendant presented the affidavit of one of the jurors containing the following: "During the deliberations of the jury, Walter Coggeshall, one of the jury, stated that defendant was a crack shot; that he went out in the mountains hunting every summer and that he, the defendant, could shoot the buttons off of a person's coat one after the other, and argued that being so he could have shot the deceased in the foot or arm and not where he did shoot him." The affidavit was admitted without objection and was considered by the trial court. [1] While a juror is not a competent witness to impeach his own verdict, except in case of a resort to chance, his incompetency may be waived and must be held to have been waived by failure to object. (*People* v. *Chin Non,* 146 Cal. 561 [80 Pac. 681]; *Milbourne* v. *Robison,* 132 Mo. App. 198 [110 S. W. 598].) [2] The evidence contained in the affidavit was competent. Failure to object on the ground of incompetency of a witness who gives competent testimony is a waiver of such incompetency. (*People* v. *Singh,* 182 Cal. 457 [188 Pac. 987].)

There is evidence to the effect that the defendant was under the influence of liquor but not drunk, though he and some other witnesses testified that he was sober. A natural inference from the verdict of the jury is that they concluded the defendant acted too hastily and recklessly in shooting the deceased and that he could reasonably have defended himself without taking life. If, as stated by the juror, he is an expert shot, he might well have shot to disable the deceased instead of killing him. If immediately after killing the one man and arresting the other, who was intoxicated, the defendant shot at the latter on his attempt to escape, the jury would probably attribute to him a reckless dis-

regard for human life and the more readily conclude that he shot the deceased without any real necessity therefor. The natural effect of the facts improperly before the jury would be to prejudice the defendant's case. It may be that the jury would have returned a verdict of guilty on the evidence regularly admitted during the progress of the trial, but the defendant had the right to a decision of the jury uninfluenced by the evidence improperly received out of court. [3] A careful consideration of the whole case, including the evidence, leads to the conclusion that the defendant is entitled to a new trial.

The judgment and the order denying a new trial are reversed.

Hart, J., concurred.