[Crim. No. 49. Fifth Dist. May 13, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. RICHARD W. BLACK et al., Defendants and Appellants.

Floyd S. Hill, Harold D. Sandell and Sandell & Carter for Defendants and Appellants.

Stanley Mosk, Attorney General, Raymond M. Momboisse and Edsel W. Haws, Deputy Attorneys General, for Plaintiff and Respondent.

BROWN (R.M.), J.—An information was filed charging the defendants with the violation of section 211a of the Penal Code by the armed robbery of Mrs. Sally Temple, a similar violation of armed robbery involving Mr. Temple, a count charging the kidnaping of Mrs. Temple, a similar violation as to Mr. Temple, a count charging violation of Penal Code section 459 for burglary and entering the dwelling house of Mr. and Mrs. Temple, and the last count charging the burglary of the J. C. Penney Company store in Fresno.

Appellant Black was charged with six prior convictions and appellant Ebell, with four prior convictions, all of which were admitted by appellants.

After a jury trial, appellants were found guilty of all six counts, and it was found that appellants were armed, fixing the degree of robbery in the first degree and burglary in the first degree.

On November 21, 1961, Mrs. Temple arrived at her home at 5:30 p.m. and upon entering her kitchen was met by a man (Intruder No. 1) wearing a mask having a large nose and teeth, attired in a two-piece coverall suit and pointed toe, loafer-type shoes. Mrs. Temple fainted and upon reviving was dragged by the intruder from the kitchen into the living room, was asked when her husband was coming home and was required to sit on the couch where she stated she usually sat when her husband arrived at evening time. The intruder advised her that he wanted money; after walking around the house she was taken into the bedroom where the sheets had previously been torn into strips, her hands were tied with wire, and a strip of sheet was tied over her mouth, and she was ordered to lie upon the bed.

Her husband, Mr. Temple, manager of the Fresno J. C. Pen-

ney Company store, arrived home at 6:10 p.m. and was met in the kitchen by the intruder who, at gun-point, ordered Mr. Temple into the bedroom where he was searched, money was removed from his wallet by the intruder, as well as the keys to the J. C. Penney Company store and the code to the combination of the store safe which was in Mr. Temple's wallet, the intruder stating, "If it doesn't work we are going to kill you and your wife." The intruder then ordered Mr. Temple to untie his wife and they were taken to the patio room, the television set was turned on by Mr. Temple on orders of the intruder, and Mr. Temple was questioned as to what time the janitors came to work at the store, when they ate and the time of the shift change, to which Mr. Temple stated that the store hired a janitorial service so that he wouldn't know the details about the janitors, and the intruder said, "Now, if I find you aren't telling the truth, I will kill you and we will kill your wife."

The telephone rang four times and stopped; Mr. Temple was ordered not to answer it, but again it rang and he was instructed to answer the call, which caller asked, "Are you hiring any men at Penneys?" Mr. Temple advised the caller to come in the following day and file an application; the intruder then took the phone and stated to the caller, "We are in the house and things are going according to plan." The intruder then made a phone call, using a foreign accent, stating that everything was going according to plan. About 15 minutes later Intruder No. 2 arrived wearing a mask and hood, being a person somewhat shorter than Intruder No. 1, and wearing a tan carcoat.

After ransacking the house, the intruders took between $40 and $60 from Mrs. Temple's coin purse which was in the bedroom, as well as the money from Mr. Temple's wallet.

At approximately 9:30 p.m. after obtaining a straw hat and a felt hat with a J. C. Penney Company label from the residence, the intruders left the house with the Temples as hostages, Mrs. Temple's hands were retied with wire; she was blindfolded with a hood, and the first intruder placed her in the front seat of a car; the second intruder with Mr. Temple, got into another car. It was understood between the intruders that if a shot came from inside the store or any confusion resulted, the first intruder was to kill Mrs. Temple and make his getaway.

Mr. Temple drove the car to the store, with the second intruder sitting in the back seat with a gun. They arrived at

the store at about 10 p.m. and the second intruder removed his mask and walked with Mr. Temple from the car to the store, Mr. Temple having been ordered to carry one of the two briefcases which were taken from the home. Mr. Temple opened the store door while the intruder was replacing his mask, at which time Mr. Temple got a view of the side of his head, and in his testimony Mr. Temple testified he believed that this person was appellant Black, basing his identification on Black's stature and size and "the side of his face with the neat cut little sideburn." He also testified, "It was Mr. Black, sitting on the end of the table over there. Neat little sideburns and high cheekbones." Deputy District Attorney Smith asked Mr. Temple on redirect examination, ". . . can you swear that it is he?" to which Mr. Temple replied, "No. . . . But it is awful close."

Mr. Temple and Intruder No. 2 proceeded to the fourth floor of the building where two janitors were met and searched by the intruder; they all proceeded to the money room where the safe was located; the janitors' hands and feet were tied, and Mr. Temple complied with the order to open the safe and then his hands and feet were tied. The intruder then proceeded to fill one of the briefcases with money from the safe; he left the store for five minutes and when he returned removed additional moneys from the safe, placing the coins in a pillow case or flour sack; a stockroom truck was used to transport the heavy load to the stairway. The total amount taken, including checks, was $46,497.37, and the net loss was $41,793.37, excluding the checks returned by the police and bad checks.

Meanwhile, Intruder No. 1, with Mrs. Temple tied and blindfolded, was driving around the city, stopping occasionally for short periods where, at one stop, someone threw something in the back seat and said, "I have got it," and at another stop someone came to the car and said, "You will have to come and help me," and after being gone for five minutes returned and placed something heavy in the back seat which was subsequently removed from the car. The car was abandoned and Mrs. Temple called the police from a nearby residence.

At a second Fresno Police lineup, Mrs. Temple, upon observing appellant Ebell, could not positively swear that he was one of the intruders, but she testified that the shoes worn by appellant Ebell during the lineup were similar, if not identical, to the shoes worn by the first intruder and that the

shape of the shoulders, being stooped to a certain extent, was similar.

This was the order of the introduction of the testimony of Mr. and Mrs. Temple and presents the problem as to whether or not this is sufficient proof of a conspiracy at this point before the introduction of the testimony of witnesses Mr. and Mrs. Brown and subsequent testimony.

Mr. Brown testified that he had known appellant Black for two years, that on Sunday, November 19, 1961, he and his wife went to Black's residence when appellant Ebell and Mrs. Ebell were present, that Black stated that he wanted to talk to Brown and they went into the kitchen, leaving Ebell and Mrs. Brown in the front room; that Black stated to Brown that he had a job which was to take place on the following Tuesday and asked if Brown would be interested, that Brown's part would be to tie, gag and blindfold some people and that he would get $500 for his part, and if the total job was $10,000, he was to receive $1,000. Brown asked for time to think it over and stated he would let Black know by at least 8 o'clock of the morning of the following Tuesday. After returning from the kitchen, Black and Mr. Brown joined Ebell and Mrs. Brown. On the following Tuesday Mr. Brown telephoned Mr. Black that he was not interested in the proposition. Brown also testified that on the following Friday, November 24th, the appellant Black bought him a drink and Brown told appellant Black that he "didn't expect it to be that large a job."

Mrs. Brown testified that she had gone to appellant Black's residence with her husband on November 19, 1961; that she remained in the front room with appellant Ebell while her husband and Black went into the kitchen; that she asked Ebell the nature of the conversation and Ebell answered that they were talking business. She asked Ebell, "Is it anything that could get Dudley into any kind of trouble?" and Ebell replied, "If he can't be trusted, now is the time to tell him to cut out or Blackie wouldn't hesitate to bury him." She went toward the kitchen to talk to her husband and appellant Black told her to go back to the living room. After leaving the Black residence, Mr. Brown informed her of the conversation in the kitchen with Black, and she testified that on Friday night, November 24th, following the robbery, she had a conversation with Black during the time that he was driving her home when Black stated to her, ". . . Dudley [her husband] was pretty weak, and he said that he didn't know how to go

out and get what he wanted. He said that he was a man that knew what he wanted, and knew how to get it,'' and also. stated, ''Look at me, I am driving an old clunker, and here I am sitting on $20,000.''

Other evidence introduced was the testimony of witness Hayes that he had known appellant Black for two and a half years, owning a bar which Black frequented, and that during the middle of November 1961 Black asked to rent a house from him for use in connection with a robbery which was to occur on November 21, 1961; that Black told him he needed the house to change clothes in after the robbery, that he would repay Hayes $300 on a debt from the proceeds of the robbery. Hayes showed Black the house and gave him the keys to it. He testified that the day following the Penney robbery Black stated to him that the robbery had netted $43,000, which was more than expected. Black gave $8,000 in bills to Hayes to keep for him and also gave Hayes some change which was in a pillow case; Hayes disposed of two sets of clothing which included a straw hat and a felt hat which had on it a J. C. Penney label. Hayes testified that Black told him the mask used in the robbery had been dumped in the ocean and that certain checks were thrown out over on the coast somewhere.

Witness Goo testified that Black had repaid a note to him in the amount of $2,300 in the first part of December 1961, and that Black had requested him to change some coins, having approximately $935 in change.

Witness Kane met appellant Black in the same cell in the Fresno County Jail and testified that over a period of time Black had related the entire story of the Penney robbery to him along the same lines as outlined hereinabove.

Witness Antipas was a cellmate of appellant Ebell and testified that he had heard conversations between Ebell and Zingarelli, a friend of Ebell's, and that Ebell in this conversation had told about how he was ''making along'' and that what Zingarelli had heard wasn't too good and, ''But I will tell you one thing, I have $1,500 and a good alibi saved up to fight them with'' and also, that Ebell had stated with reference to the Penney robbery, ''Man, I can't cop, if I do I'm dead,'' and Ebell also admitted spending some of the fruits of the robbery in Mexico and giving some of the money to a girl to hold for him; that regarding the robbery, Ebell stated, ''Well, they can't prove anything'' because ''we were too well camouflaged,'' and that he was worried about his wife

that "she might sing." And on returning from the lineup, Ebell stated, "Someone identified the shoes that I had on" and "She sure identified them."

Mr. Temple was recalled and identified the voice of the second intruder as that of appellant Black.

It is appellants' contention that the admission of testimony of Dudley Brown and Frances Brown as to each appellant, over appellants' objections, was error because at that time a conspiracy had not been established.

The sufficiency of the evidence to sustain the verdicts is not challenged or questioned by the appellants, but it is contended that it was prejudicial error to admit the testimony of the Browns against both appellants. This testimony was introduced subject to a striking of said testimony reserved by the court, which motions were subsequently denied.

The appellants do not complain of the rule that once a conspiracy has been established the statements and/or admissions or declarations of the coconspirators are admissible as to all other members of the conspiracy, nor do appellants contend that conspiracy has to be charged in the information. (*People* v. *Terrell,* 138 Cal.App.2d 35, 54 [291 P.2d 155].)

It is argued that such evidence can be admitted only after proof of the conspiracy and appellants contend that a conspiracy had not been proven prior to the admission of the Browns' testimony but that the Browns' testimony was necessary to establish the conspiracy as to the defendants and thus these conversations, if admitted as an exception to the hearsay rule, were actually admitted before a conspiracy had been established.

A criminal conspiracy is a corrupt agreement of two or more persons to commit an offense prohibited by statute, accompanied by some overt act in furtherance of the object of the agreement. (Pen. Code, §§ 182, 184; *People* v. *Cornette,* 158 Cal.App.2d 724, 729 [322 P.2d 1001].) Appellants cite this as a "bootstrap" operation to allow these hearsay statements to establish the conspiracy, and they rely on *People* v. *Doble,* 203 Cal. 510, 516-517 [265 P. 184], which states, ". . . the acts and declarations of a co-conspirator were not binding unless and until, . . . a conspiracy had been shown beyond a reasonable doubt to exist, and in no case should such declarations be received as proof of the conspiracy." However, the court goes on to state that the order of proof is in the discretion of the court. (See also *People* v. *Ferlin,* 203 Cal. 587, 599 [265 P. 230].)

■ Conspiracy cannot be established by suspicion; there must be some evidence (*People* v. *Long,* 7 Cal.App. 27, 33 [93 P. 387]); and the danger of admitting hearsay testimony is that it might be accepted by the jury as proof of the existence of the conspiracy. ■ It is true that "[t]he fact of conspiracy cannot be proved by evidence of extrajudicial declarations of an alleged coconspirator" (*Davis* v. *Superior Court,* 175 Cal.App.2d 8, 24 [345 P.2d 513]); "[t]here must be evidence of some participation or interest in the commission of the offense" (*People* v. *Toledo-Corro,* 174 Cal.App.2d 812, 820 [345 P.2d 529]; *Ong Way Jong* v. *United States,* 245 F.2d 392, 394).

■ The rules set forth in *People* v. *Doble, supra,* 203 Cal. 510, have been modified by *People* v. *Steccone,* 36 Cal.2d 234 [223 P.2d 17] at page 238, where the court states that before the declarations of an alleged coconspirator are admissible against another coconspirator, such conspiracy must be proved, but that this is recognized as a rule of evidence and that the fact of the conspiracy need be proved only to the extent of establishing prima facie evidence of the fact—not established by a preponderance of the evidence in a civil action nor beyond a reasonable doubt in a criminal action, which latter applies only to the issue of guilt, and that any evidence received by virtue of this rule necessarily is received conditionally, for in the final analysis, the jury must first pass judgment as to whether the asserted conspiracy has been proved. ■ Thus, a prima facie showing of the conspiracy is established where the evidence and the reasonable inferences that may be drawn therefrom point to the probability of collaboration between the conspirators (*People* v. *Pacheco,* 194 Cal.App.2d 191, 197 [14 Cal.Rptr. 840]).

■ Code of Civil Procedure section 1870, subdivision 6, states that, "After proof of a conspiracy, the act or declaration of a conspirator against his co-conspirator, and relating to the conspiracy" is admissible in evidence. The court said in *People* v. *Cancimilla,* 197 Cal.App.2d 242, 249-250 [17 Cal. Rptr. 498]:

"This section of the Code of Civil Procedure [§ 1870], . . . is not a rule of substantive criminal law. It is a rule of evidence. [Citation.] The section has also been construed as a direction regarding the order of proof in which the trial court is vested with discretion to allow chronological presentation of the prosecution's evidence, mingling acts and declarations of conspirators with other evidence where facts from

which the conspiracy can be inferred are so enmeshed with other facts going to constitute the crime and so interwoven with conversations that it is difficult to separate them.''

''Sometimes, for the sake of convenience, evidence of the acts and declarations of an alleged conspirator is admitted before sufficient proof of the conspiracy is given. [Citations.] . . . Also, the order in which the evidence in a trial is admitted is a matter within the sound discretion of the trial court.'' (*People* v. *Sica,* 112 Cal.App.2d 574, 584 [247 P.2d 72].)

There was no abuse of such discretion in this case. In the application of these principles of evidence, a prima facie showing was made of the conspiracy sufficient to admit the evidence of the testimony of the Browns against each appellant by the identification of the appellants by Mr. and Mrs. Temple. The testimony of the Temples clearly establishes that a prima facie showing was made of the criminal conspiracy of the appellants and subsequent testimony confirms the showing made.

### Conduct of Juror

The appellants' second ground of appeal is alleged misconduct of the jury on which they made a motion for a new trial which was denied.

Marjorie Peste, daughter of juror Churchill, called by appellants, testified orally that at a lunch counter near the courthouse she had lunch with her mother and with a friend, Carol Gilbert; that she definitely could not remember whether in the presence of her mother she (Peste) said, ''Did she really think that could be that they had a toilet bowl telephone?'' which question refers to the testimony of Antipas, one of the witnesses; and that she could not remember whether her mother replied or laughed. As to the remarks made by the witness (Peste) and Carol Gilbert concerning Phyllis Ebell, Mrs. Peste said that they both made remarks and her mother said, ''I am not supposed to discuss the case,'' but she did not recall ever making such remarks in front of her mother but only to her girlfriend, and her mother never at any time discussed the evidence of the case or gave any opinion about the guilt or innocence of the parties, though Mrs. Peste did recall stating, ''They should let them go because with all that money they might be able to spend it on us,'' and she thinks her mother smiled and said, ''Both of you are nuts.''

Carol Gilbert, also called by appellants, testified that she had lunch with Mrs. Peste and Mrs. Churchill and that juror

Churchill did not enter into the conversations mentioned, but she could not remember whether the remark about Phyllis Ebell was at lunch or at her home with witness Peste, and she heard no conversations relative to the toilet telephone, and the remark about spending the money ''on us'' was said jokingly at the table.

Juror Churchill, called as a witness on behalf of the People without objection by appellants stated that she had lunch with her daughter and Carol Gilbert; that she did not remember who brought up the subject of Mrs. Ebell living with several men, but dropped the subject as it was not interesting; did not recall any statements about Mrs. Ebell living with other men while Black and Ebell were in jail, and said she had no opinion with regard to the case. That with regard to the testimony of Antipas, she testified, ''I think we did laugh and say it was a funny way of telephoning''; that as far as Mrs. Ebell's living with other men was concerned, ''. . . it was a remark that we had heard spoken here, that she had men living with her''; that she did not recall her daughter making any reference to Phyllis Ebell living with other men while the appellants were in jail; that she at no time heard any remark about Mr. Ebell and Mr. Black being turned loose so the money could be spent on witness Peste and witness Gilbert; that there were no opinions regarding any evidence mentioned by any of the witnesses; and that she only heard the toilet telephone mentioned one time.

The rule forbidding impeachment of a verdict by affidavits of a juror, except resort to chance and by false answers on *voir dire,* is reiterated in *Sopp* v. *Smith,* 59 Cal.2d 12, 14 [27 Cal.Rptr. 593, 377 P.2d 649]; *Markaway* v. *Keesling,* 211 Cal.App.2d 607, 610-611 [27 Cal.Rptr. 583]; and *People* v. *Kady,* 60 Cal.App. 661, 667 [214 P. 293]. It can be properly waived by the district attorney when there is no objection (*People* v. *Chin Non,* 146 Cal. 561, 566-567 [80 P. 681]). The *Chin Non* case referred to newspaper articles and particularly where the articles did prominently discuss the testimony of the witnesses. While affidavits for the impeachment of the verdict may be received, oral evidence may likewise be received (*People* v. *Crosby,* 139 Cal.App.2d 101 [292 .P.2d 922]).

''[I]t is well settled that jurors are legally disabled to impeach their verdict by any means, whether it be by affidavit or by testimony or by extrajudicial statements, . . .'' (*People* v. *King,* 40 Cal.App.2d 137, 143 [104 P.2d 521].)

■ The general rule is that testimony of a juror may not be received to impeach the verdict. In *People* v. *Hancock,* 1 Cal.App.2d 577 [37 P.2d 120], affidavits of a juror were received alleging that the juror's decision was not affected or influenced by the reading of a newspaper article, but the court stated that there was no showing that the reading of the newspaper item was prejudicial to the appellants but was to the contrary, and that the entire evidence was such that it would be an insult to the intelligence of the jury to say that they could have found to the contrary; that the trial court did not abuse its discretion in denying the motion for a new trial, that the matter in question did not affect the verdict nor was it prejudicial as a matter of law. The incompetency of a juror to impeach his verdict may be waived by failure to object (*People* v. *Evans,* 63 Cal.App. 777, 782 [220 P. 309]).

■ "It is also the controlling law of this state that even where affidavits can properly be received to impeach the verdict of a jury they must be accompanied by an affirmative showing that neither the moving party nor his counsel had knowledge of the misconduct relied on prior to the rendition of the verdict. The absence of such a showing in support of the motion for new trial is fatal." (*Markaway* v. *Keesling,* 211 Cal.App.2d 607, 612 [27 Cal.Rptr. 583].)

■ As to the statements by the witnesses that the defendants should be released so the money could be spent on them, the juror testified that she did not hear this statement so the remarks of the other two witnesses to each other are immaterial as that could not be prejudicial to the defendants or considered to be misconduct of the juror.

■ The remark concerning the toilet telephone, witness Peste being an employee of a telephone company, was nothing more than a passing remark. Witness Antipas, in the trial of the case, stated that while he was in jail he had communicated with his girlfriend who was in the cell directly over him by talking through the sewer pipe connecting the two cells by the removal of the water in both toilet bowls and that he was talking to her about their forthcoming marriage, which actually did take place. This witness was not a party to the action and this phase of the testimony was in answer to a question on cross-examination by the appellants as to when he decided to get married and he said that over the sewer pipe, "we did a little transaction."

The most that can be said about the statements made in front of the juror Churchill is that they were passing remarks

which had nothing to do with the trial. While it is testified that the juror said at various times, "I am not supposed to discuss the case," and she may have felt she had stopped the discussion at that point, as stated in *People* v. *Turner*, 39 Cal. 370, at pages 374-375, the juror should have excused herself, at meals or otherwise, or at least should have requested the ceasing of the conversation, and if necessary, reported the parties to the court, and though such action may be prima facie misconduct, it is naturally subject to explanation and it is in the discretion of the trial court to deny a motion for a new trial where the court is satisfied there is no prejudice nor did it affect the verdict. Where the successful parties or the juror are not at fault, remarks made in the presence of the juror by strangers to the litigation are not necessarily grounds for a new trial (*People* v. *Kross*, 112 Cal.App.2d 602, 611 [247 P.2d 44], quoting from 66 C.J.S. § 51, p. 165).

Even in *People* v. *Brannigan*, 21 Cal. 337, where the proprietor of the hotel stated to all the jurors at a dinner, "Stick to it until you rot and the pismires carry you out, but what you convict him," the court held at page 342 that such a passing remark, however improper, does not constitute misconduct of the jury.

" '. . . where the interference of strangers with the jury is unattended with corruption in the latter, and has not been prompted by a party, and it does not appear that any injustice has thereby been done, the verdict will not be disturbed, whether the cause be civil or criminal, a capital trial or otherwise.' (2 Graham & Waterman on New Trials, 317.) " (*People* v. *Boggs*, 20 Cal. 432, 435.)

In *People*. v. *Pyle*, 44 Cal.App. 130, 133 [185 P. 1019], the court stated: "This brings us to the consideration of the last point, viz., the alleged abuse of discretion by the learned trial judge. In support of his motion for a new trial defendant filed two affidavits wherein it was stated that one Doyle had stated to defendant's attorney, outside the courtroom, and in the presence of some of the jurors, that he, Doyle, would 'fix' defendant; that defendant beat him out of some money, and that for what defendant's attorney had done, he, Doyle, would have defendant arrested. This, if true, was reprehensible; but in the absence of a showing that such alleged statements influenced the verdict of the jury we think it was not an abuse of discretion to deny defendant's motion. Unless we go out and into the thin air of metaphysics for inspiration and wholly

disregard the ample evidence, independently of the alleged statements, to sustain the verdict of the jury, and arbitrarily hold that such alleged statements probably influenced the verdict, defendant's contention can find no support. It is not surprising that in these days of unrest that thoughtful men and women, while conceding the improbability of the conviction of an innocent person, under our system of courts and jurisprudence, are extremely apprehensive as to whether we can convict the guilty. To find the learned trial court guilty of an abuse of discretion under the evidence as disclosed by this record would, we think, be to furnish evidence in support of the pessimistic assumption to which we have just referred. 'A new trial will not be granted because of remarks about the case made during the trial to jurors or in the hearing of jurors, by strangers to the litigation, where neither the successful party nor the jurors were at fault, unless such remarks probably influenced the verdict.' (29 Cyc. 798.)" ·

"The mere showing of such a communication does not raise a presumption that the juror was improperly influenced" (*People* v. *Cobb*, 45 Cal.2d 158, 161 [287 P.2d 752]).

Appellant Black, on his own direct testimony, stated that he was living with appellant Ebell's wife. Appellants contend that the remarks made by the witnesses concerning this matter in the presence of the juror would be reprehensible to the average person, holding the appellants up to shame and degradation. Thus, while it was improper for juror Churchill to hear such a conversation out of court, it cannot be said to be prejudicial. Such remarks had nothing to do with the commission of the crime.

The testimony of juror Churchill generally denies the facts as to what was said in her presence. If there was any conflict in the testimony of the other two witnesses this was for the trier of the facts to decide (*People* v. *Henderson*, 79 Cal.App.2d 94, 123 [179 P.2d 406]). The court, in the *Henderson* case, *supra*, at page 124, further said: "It is elementary law that the decision of the trial court in denying a motion for a new trial after considering conflicting affidavits is final in the absence of a showing of abuse of discretion...."

Thus, whether we disregard the testimony of juror Churchill on the ground that a juror cannot impeach the verdict, or consider such testimony since it is received only in support of the verdict, there has been no showing that the passing

remarks were prejudicial in any way to the appellants (*People* v. *Hancock, supra,* 1 Cal.App.2d 577).

In *People* v. *Jackson,* 106 Cal.App.2d 114 [234 P.2d 766], at page 125, the court said: "The verdict of the jury cannot be impeached in this manner [by letters] and no grounds were presented which would permit the impeachment of the verdict. [Citations.]

"We have examined the entire record in this matter and conclude that the evidence sustains the verdict of the jury and that there were no prejudicial errors in the rulings of the court."

"A verdict which cannot be impeached by the affidavit of a juror cannot be impeached by affidavits of third persons which merely set forth the substance of the extrajudicial statements made by the juror. (*People* v. *Giminiani,* 45 Cal.App.2d 535 [114 P.2d 392].)" (*Markaway* v. *Keesling,* 211 Cal.App.2d 607, 611 [27 Cal.Rptr. 583].)

In the absence of something more than the showing that is made here, we must hold that the juror was not guilty of misconduct and that the defendants were not injured. (See *People* v. *West,* 73 Cal. 345, 347 [14 P. 848].)

We have not burdened this opinion with a summary of all of the evidence which is favorable to respondent. A careful review of the record as a whole shows that the evidence of guilt is overwhelming.

The judgment is affirmed.

Conley, P. J., and Stone, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 10, 1963.