[Crim. No. 1415.   Fourth Dist.   Oct. 28, 1959.]

THE PEOPLE, Respondent, v. MANUEL TOLEDO-CORRO
et al., Defendants; JUAN SORIA-FLORES, Appellant.

Harrison Tellyer for Appellant.

Stanley Mosk, Attorney General, and S. Clark Moore, Deputy Attorney General, for Respondent.

SHEPARD, J.—The defendant Juan Soria-Flores was charged, tried and convicted along with three other defendants of the crime of conspiracy to violate section 11500 of the Health and Safety Code of the State of California, and a second count of a violation of said section 11500 in selling, furnishing or giving away narcotics (heroin) as forbidden by said section. This defendant is the sole appellant. He appeals from the judgment and from an order denying a motion for a new trial.

The scene of the crime was at "Sparky's Café" in Chula Vista, California, near the intersection of Broadway and "G" Streets. On June 26, 1958, H. V. Springett, a narcotics inspector of the State of California, made contact with defendant Manuel Toledo-Corro (hereinafter called Corro) at about 2:30 p. m. and partly arranged for the purchase from Corro of a quantity of heroin. Appellant was not present but Corro had borrowed and was driving at 1954 Mercury automobile (hereinafter called Mercury) which was owned by this appellant. Springett arranged to meet Corro at 6 p. m. to take delivery but the appointment was not kept by Corro. However, Corro was seen to drive in the Mercury slowly by the meeting place (Sparky's Café). On the same night or the next day (the evidence is conflicting) appellant with Corro and another defendant called Jose Angel Plata-Silva (hereinafter called Silva) drove in the Mercury to Los Angeles and return. The Mercury had no license plates when seen in Chula Vista. On July 2, 1958, Officer Springett again made contact at about 9 p.m. at Sparky's Café with Corro and another defendant named Pedro Garcia de Leon Arechiga (hereinafter called Arechiga). During this contact, according to the testimony of Officer Springett, Arechiga commented respecting the Los Angeles trip of the Mercury, that "they" were low on money, wanted to make a deal but could not "reach anybody at the number that you gave them," and that they did have the "stuff" with them. Again appellant was not present. However, appellant and defendant Silva had come from Mexico to Chula Vista with Corro and Arechiga. The appellant was seen to drive slowly north on Broadway and to return

south on Broadway past Sparky's Café during the time Corro and Arechiga were therein talking to Springett about the delivery of heroin. Again, the Mercury had no license plates. At about 10 o'clock on the same evening the Mercury crossed the Mexican border going south with all four defendants in the car, and the license plates were then on the car.

On July 8, 1959, the final contact was made by Springett with Corro and Arechiga at Sparky's Café. Again appellant was not present. Corro and Arechiga came from Mexico in a Plymouth automobile and according to Corro brought with them in that car the heroin which was later delivered to Springett. The Plymouth was parked somewhere on or near Broadway not far from Sparky's Café. The exact location is not shown by the record. Scattered around the immediate vicinity but unknown to any of the defendants were six other officers who acted as observers and assisted in the final arrest. Appellant and Silva came in the Mercury to Chula Vista the same evening and parked near a grocery store called "Angel's Market" about 350 or 400 feet south of the intersection of Broadway and "G" Streets. (Sparky's Café was 80 to 90 feet north of this intersection.) There is no evidence that the two cars came together or at the same time. During the negotiations between Corro and Springett in Sparky's Café Corro told Springett to wait while he went to "pick it up" from another fellow. He left the café and was observed by another officer to walk to the vicinity of the Mercury. Whether or not he also went to or near the Plymouth is not disclosed. There is no testimony that he either got into, reached into, or took anything from the Mercury. The testimony shows that appellant and Silva were not then in the car. Corro then returned to the café and Springett says that upon entering Corro had a noticeable bulge in his left front pants pocket which he, Springett, had not theretofore been able to detect. Two other observing officers in the cafe testified to the same effect. Corro says that he went out of the cafe merely to see if there was anything suspicious. The left front pants pocket of Corro was the one from which the heroin was later produced by Corro when the delivery was made at the nearby Monterey Motel. The heroin was in four small latex bags contained within a large plastic bag. The total amount of heroin was about 4.1 ounces. Shortly after delivery Springett, Corro and Arechiga went to Springett's car and Corro and Arechiga were then arrested. Appellant and Silva were ar-

rested by other officers on the sidewalk near the market, which from the other measurements given by the officers would place appellant approximately 500 feet, more or less, away from the scene of Springett's negotiations with Corro. Appellant says he was walking towards the Mercury and the officer says he was walking away from it at the time of the arrest. However, there is no hint or indication in any of the testimony that appellant ran, attempted to escape or in any way denied ownership of the car. Officers Kingsbury, Spohr and Allen made the arrest of appellant and Silva. Officer Lohman searched appellant's car and found in the glove compartment an automatic pistol. Appellant had had 12 years of service with the Federal Security Police of Mexico. It was established without contradiction that there then existed an unwritten custom to allow accredited police officers on both sides of the border to carry their weapons when temporarily crossing either side of the border. Appellant says he gave the keys of the car to a police officer to open the glove compartment. Officer Lohman says that when he searched the car he did not use the keys as the glove compartment was already unlocked. The evidence also shows without contradiction that it was the custom of the Motor Vehicle Registration Department of Mexico at that time to take up the license plates of a motor vehicle upon a change of ownership, and to issue a permit in lieu thereof until new license plates could be secured.

The central figure of guilt was Corro, who was a fellow officer with appellant in the Federal Security Police force of Mexico, but their acquaintanceship existed only for about a year and a half. They were on friendly terms and appellant occasionally loaned Corro his car. Appellant bought the Mercury second-hand in June, 1958. On transfer, the Vehicle Registration Department took up the old license plates and issued a temporary permit. Appellant testified that the time between taking up the plates and putting on new ones would ordinarily be three or four days. Exactly when the plates were taken up and when the new plates were put on is not clear, nor does the record contain any license plates numbers so that we are without information as to whether the license plates seen on July 2d were new or old. The officers were never asked about these numbers so we do not know whether they were recorded. The prosecution directs our attention to three principal points of alleged discrepancy between the testimony of the officers and this appellant. One relates to the

question of whether or not the license plates were on the car in Chula Vista on July 2d, and later on the same evening at the Mexican border crossing. Appellant says he does not remember if the plates were on at that time or not, but that he made no change between Chula Vista and the Mexican border. There is no testimony that the plates were missing on July 8, the date when the actual delivery of the narcotics was made by Corro. It should be here noted that July 8 was the very time when, if appellant had any knowledge of the existence of a conspiracy or of the narcotic being delivered, he would be expected to remove the license plates.

The second discrepancy cited is regarding which way appellant was walking on the sidewalk when arrested. As hereinbefore noted, there is no evidence that Corro contacted appellant at any time on the evening of July 8, nor that appellant was in his car at the time Corro was described as having walked to that car. Nor is there any evidence that Corro looked in, reached in, or entered appellant's car or that that car contained contraband. There is no evidence that appellant denied ownership of the car nor made the slightest move to escape. Appellant's statement of what he had purchased by way of household supplies is corroborated by Officer Hawkins, and is nowhere contradicted. Narcotic chemist J. A. Allen, who had followed appellant's car from the border to Chula Vista earlier in the evening and assisted in the arrest of appellant, did not even see appellant's car at the time of the arrest. It is incredible that Officer Allen, assisting in the arrest, would not have seen appellant's car had the officers made any point of what direction appellant and Silva were walking. This alleged discrepancy is completely. devoid of any inculpatory inference.

The third alleged discrepancy relates to the purported difference in testimony as to whether or not the glove compartment of the car was locked or unlocked. The presence of the weapon itself is fully explained by the uncontradicted testimony of prosecution witnesses regarding the custom of accredited police officers temporarily crossing the border. The arrest was made by Officers Kingsbury, Spohr and Allen. The search was made by Officer Lohman. The record does not show to which officer the key was given. Apparently during the trial neither the prosecution nor the defense regarded the question of who locked or unlocked the glove compartment as of any importance, and the evidence was left entirely

incomplete in this regard. In this state of the record it cannot be said that any witness stated an untruth nor that there was any conflict, with the loose ends of the evidence thus left completely untied. We can find no inculpatory evidence with respect to the pistol.

Since the package of heroin contained only 4.1 ounces, and since there is no evidence that the containers were disproportionate in size to the contents, it would seem apparent that the package would not be greater in size than numerous articles frequently carried by men in their pants pocket, such as a King-size package of cigarettes, a can of tobacco, or a large handkerchief. The testimony as to the bulge in Corro's pocket is entirely in nebulously relative terminology. The record before us, therefore, contains no evidence that the package was of such a size as to excite suspicion on the part of a companion if we assume that Corro ever did carry the package on his person in the presence of appellant. The evidence does not clearly show, although there is a possible inference, that Corro ever carried the narcotics on his person in the presence of appellant.

The town of Chula Vista is but a short distance from the Mexican border crossing. Under the border crossing conditions shown by the record herein there could not reasonably be anything suspicious in frequent visits thereto, either by acquaintances together or at the same time in separate cars.

Appellant is not placed in Sparky's Café nor at any other place where he could have overheard any inculpatory talk referred to in the testimony. Nowhere in the evidence does there appear any conversation or act in the presence of appellant that could reasonably be expected to cause appellant to be suspicious or put on inquiry. ■ However, the Supreme Court of California has clearly and unequivocally approved certain rules of law which appear to control our decision when we consider the matter of license plates. Those rules are as follows:

" 'The evidence of inculpatory participation need not be direct nor extend to every fact and detail. It may be circumstantial and is sufficient, even though slight, if it tend to connect the defendant with the commission of the crime.' . . . 'Of course, as has been pointed out many times, disbelief of evidence is not the equivalent of affirmative evidence to the contrary . . . ■ But where a material fact is established by evidence and it is shown that a defendant's testimony as

to that fact was wilfully untrue, this circumstance not only furnishes a ground for disbelieving other testimony of this defendant [citations], but also tends to show consciousness of guilt or liability on his part and has probative force in connection with other evidence on the issue of such guilt or liability. Such false testimony is in the nature of an admission from which with other evidence guilt or liability may be inferred. [Citations.]'' (*People* v. *Wayne,* 41 Cal.2d 814, 822, 823 [3-4] [264 P.2d 547].)

"As a general rule, a conspiracy can only be established by circumstantial evidence 'for, as the courts have said, it is not often that the direct fact of an unlawful design which is the essence of a conspiracy can be proved otherwise than by the establishment of independent facts, bearing more or less closely or remotely upon the common design (5 Cal.Jur. 521) ; and it is not necessary to show that the parties met and actually agreed to undertake the performance of the unlawful acts (citing authority), nor that they had previously arranged a detailed plan . . . for the execution of the conspiracy (citing authority).' (*People* v. *Sampsell,* 104 Cal.App. 431, 438-439 [286 P. 434].)'' (*People* v. *Steccone,* 36 Cal.2d 234, 237 [2-3] [223 P.2d 17].)

"The decision of the jury, which has been approved by the trial judge in the denial of a motion for a new trial, will not be set aside on appeal unless there is no substantial evidence upon any hypothesis whatsoever to support the verdict of the jury and the conclusion of the trial court.'' (*People* v. *Robinson,* 43 Cal.2d 132, 136 [3] [271 P.2d 865].)

"While mere association does not make a conspiracy, it is settled that the fact of conspiracy may be proved circumstantially by evidence of other facts and circumstances, when they are inconsistent with any other rational conclusion and when thus being inconsistent, it may be fairly inferred that a conspiracy does in fact exist.'' (*People* v. *Weber,* 7 Cal. App.2d 620, 622 [1] [46 P.2d 222].)

However, this rule, which is similar to the rule that of two reasonable constructions the jury must adopt that which is consistent with the defendant's innocence, is one for the trier of fact and not the appellate court to apply. (*People* v. *Roberts,* 40 Cal.2d 483, 488 [7] [254 P.2d 501].) In addition,

" 'We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from

the evidence, and then determine whether such facts are sufficient to support the verdict.' ■ If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury.'' (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].)

■ We recognize that conspiracies cannot be established by suspicions. There must be some evidence. Mere association does not make a conspiracy. There must be evidence of some participation or interest in the commission of the offense. (*People* v. *Long,* 7 Cal.App. 27, 33 [93 P. 387].) ■ Associations together of persons having no criminal intent is not conspiracy. (*People* v. *Bucchierre,* 57 Cal.App.2d 153, 163 [134 P.2d 505]; *Dong Haw* v. *Superior Court,* 81 Cal.App.2d 153, 158 [183 P.2d 724]; *People* v. *Zoffel,* 35 Cal.App.2d 215, 226 [95 P.2d 160].)

■ Reappraising the evidence relating to the lack of number plates on the Mercury, appellant's car, coupled with the incidents of the proved conspiracy, and regardless of how these events may under the whole record impress this appellate court, it was nevertheless possible for the jury to reasonably conclude that the defendant's statement that he had not reaffixed the number plates on his car on the night of July 2d after leaving Chula Vista and before reaching the border was wilfully false and untrue. If they believed that statement to be wilfully false and untrue they were entitled to disbelieve his other statements respecting the lack of a license plate. We cannot say this evidence was immaterial. Since we hold ourselves bound by the expressions of our Supreme Court hereinbefore quoted, we are compelled to and do hold that there was sufficient evidence to support the decision of the jury.

The judgment and order denying a motion for new trial are affirmed.

Griffin, P. J., concurred.