[Crim. No. 19788. Second Dist., Div. Two. Nov. 30, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
EUGENE EDWARD WHEELER et al., Defendants and Appellants.

[black redaction bar]

**COUNSEL**

Ronald S. Smith, under appointment by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Nelson P. Kempsky and John H. Darlington, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HERNDON, J.** — The verdict of the jury in this case convicting the appellants Eugene and Billy Wheeler of first degree murder is supported by an unusual accumulation of direct and circumstantial evidence so incriminating as to eliminate any basis for even a scintilla of doubt. The voluminous transcripts of the testimony record the sickening story of a brutal, deliberate and premeditated killing, ridiculously senseless in its motivation and utterly savage in its execution. The vicious and remorseless nature of the killers is emphasized by the vulgarity and obscenity of the language in which they couched their own statements, both self-incriminating and self-exculpatory.

We shall indicate herein our reasons for rejecting the numerous contentions advanced by appellants' counsel. We have concluded that there is no merit in any of appellants' 12 assignments of error. Moreover, even if it were assumed that any of these assignments possessed arguable technical merit, such assumed error would necessarily be classified as harmless beyond a reasonable doubt in view of the conclusive effect of the incriminating evidence.

### Summary of the Evidence

On the evening of November 5, 1969, appellant Eugene Wheeler was driving his Volkswagen in North Hollywood with his close friends Lejon Hutchinson and her sister Mischell as his companions and passengers.

[black redaction bar]

As they proceeded Lejon conceived a brilliant plan by which they would obtain "a dollar's worth of gas for a quarter." As Lejon herself testified, she suggested, prior to arriving at the gas station, that Eugene tell the attendant, the victim of the homicide, to give him a quarter's worth of gasoline when they arrived. Then Mischell and Eugene would get out of the car and go to the restrooms, whereupon Lejon would tell the attendant that Eugene had asked for a dollar's worth.

When they arrived at the gas station Eugene asked for a quarter's worth of gasoline. While the lone attendant was putting gasoline into the car, Eugene and Mischell went to the restrooms. After the attendant had put a quarter's worth of gasoline into the car, Lejon told him Eugene wanted a dollar's worth. The attendant proceeded to deliver the additional amount of gasoline.

According to Lejon, the attendant was very pleasant and did not act hostile in any way while he was delivering the gasoline. When Eugene and Mischell returned to the car the attendant asked Eugene for a dollar and Eugene responded that he had asked for only a quarter's worth. At this point Eugene and the attendant went into the station office and the attendant made a telephone call. Thereafter Eugene came out, moved the car, and indicated to Mischell and Lejon that they were going to have to wait in the gas station. During this period Eugene proceeded to empty the contents of the ash trays of his vehicle on the surface of the station grounds.

Shortly thereafter the attendant's son drove into the gas station, got out of his car, took off his jacket and walked up to Eugene. A heated argument ensued. During the course of this argument one of the men, either the victim or his son, produced a broom and dust pan and tried to persuade Eugene to sweep up the debris from the ash trays. In the meantime Mischell emerged from the Volkswagen with an empty RC Cola bottle in her hand and threatened to strike one of the attendants. Lejon restrained her. Eugene then told Mischell and Lejon to get back into the car and they complied.

Following this altercation one of the men told Eugene to put the car in the lubrication area of the service station. There they proceeded to siphon some of the gasoline from the gas tank. After completing the siphoning process the attendants asked Eugene for a quarter. Eugene delivered the quarter and thereafter he and the girls made their departure. During this siphoning procedure Eugene and the two girls were cursing and laughing at the attendant outside. At that time Eugene made a statement to the girls to the effect that he should get some of his friends and jump on the attendant.

After leaving the service station and on the trip back to Eugene's apartment, Eugene appeared to be quite angry, according to the testimony of the two girls. He made statements to the effect that he might shoot the attendant. He also told the girls that he was going over to Billy's apartment and tell him that some white boys had "jumped on him." Billy's apartment was in the same building as Eugene's. On arriving at Billy's apartment, Eugene asked Billy if he would go back to the gas station with him and Billy replied that he would. Eugene, Lejon and Mischell then returned to Eugene's apartment where Eugene changed his shirt. According to Lejon, approximately 15 minutes had elapsed from the time they left the gas station until Eugene changed his shirt and left the apartment.

About 15 to 20 minutes later, Eugene returned to the apartment. He called three of the girls who were in the apartment into the bedroom and said, "I got the mother-fucker." He also said, "I am going to need you guys. If anyone comes to the door say that I haven't left." He further stated that he had shot the service station man; that Billy also had shot him; and that he was bleeding. Eugene said that he had shot the person once and that Billy had shot him twice with a .45. According to Lejon, Eugene was laughing at the time he made these statements.

The foregoing constitutes a summary of the testimony given by appellant's friend, Lejon Hutchinson. Her sister Mischell testified that she had known Eugene for approximately 13 years and that they were close friends. Although her professed recollection of the events of the evening of November 5, 1969, was not quite so clear, Mischell's testimony corroborated that of her sister in all material and substantial respects.

Osmo Kiiha testified that he had a partnership with his father Aarne, the victim of the homicide, in the Phillips 66 gas station at Laurel Canyon Boulevard and Saticoy Street. While he was at home on the evening of November 5, 1969, his wife answered a telephone call from Aarne who was at the gas station. When she handed Osmo the phone, she indicated that someone in the background was swearing and had said words like "white mother-fucker." This made Osmo a "little upset," and he became more so when his father related that the people in the gas station had purchased gasoline and refused to pay for it. Aarne asked Osmo to come down to the gas station and help him out. Osmo also talked to appellant Eugene Wheeler, and they had a rather heated telephonic conversation.

When he arrived at the gas station, Osmo saw two women and a man sitting in a Volkswagen. The man was appellant Eugene Wheeler. Osmo and Eugene continued their argument which had begun on the phone, and Eugene got out of his car. Osmo and Eugene were preparing to fight

when the two women in the car got out and managed to prevent it. One of the women had a coke bottle in her hand and held it in a manner which indicated that she was going to hit someone with it. Aarne grabbed it and gave it to Osmo who threw it away.

Osmo noticed that there were cigarette butts strewn around on the ground in the vicinity of the Volkswagen. Aarne brought a broom and a dust pan and after a little persuasion, he and Osmo got Eugene Wheeler to clean up the cigarette butts. The atmosphere at the time was extremely hostile although Osmo did not recall any actual fighting. Throughout this time and thereafter the Kiihas and the people in the Volkswagen were calling each other names and engaging in hostile conversation.

After Eugene had finished picking up the cigarette butts, Osmo instructed him to drive onto the lube racks. Osmo then siphoned out the gasoline for which Eugene had refused to pay. Eugene and his companions then drove away.

Following this incident, Osmo left the gas station for his home. Between 15 and 20 minutes after he left the gas station he received a telephone call from someone who informed him that his father had been shot. He slammed the phone down and drove to the gas station. When Osmo arrived at the gas station his father had been removed. There were a number of police officers there, however. While he was talking to the police officers, Osmo noticed appellant Billy Wheeler when he drove into the gas station. Osmo told him that his father had been shot, and Billy stated that he had just driven in to get some water. He "acted surprised" at what had happened. When the police questioned Billy, Osmo indicated to them that he thought Billy could not have been the person who shot his father because he had been coming to the station for the last few weeks as a regular customer.

The witness Claudette Trottier testified that on the evening of November 5, she heard a loud noise while she was sitting at the cash register in her restaurant which was located across the street from the service station. The register was "right next" to the window at the front of the restaurant. The noise frightened her. She looked out the window in the direction of the gas station across the street. The lights were on next to the pumps on the Laurel Canyon side. She saw Billy Wheeler standing on the Laurel Canyon side of the gas station between the pumps and the office portion of the building. He was holding a gun in his hand. She saw him shoot the gun, move his hand and shoot again. Thereafter, he turned and jumped into the driver's side of a white car and sped away.

After she saw the shooting, she observed a man lying down on the

ground in the gas station. Then the police arrived, and an ambulance came and took the man away. About 15 minutes later, Mrs. Trottier observed Billy Wheeler return to the gas station in the white car with another person. He was not wearing the three-quarter length black jacket that she observed him wearing at the time of the shooting. When Billy put the jacket on as he was standing in the gas station the second time, Mrs. Trottier was more sure that he was the man she had seen before, but she believed he was the man even before then.

According to Mrs. Trottier, between the time of November 5, 1969 and the first time she identified Billy Wheeler at the preliminary hearing, she was shown no photographs of him and did not observe him in a lineup. The first time she recognized him at this hearing he was not wearing a jacket like the one he was wearing on the night of the shooting. Two days later she recognized him again and identified him as the man. This time he was wearing the jacket. At no time did any police officer indicate that she was to identify Billy Wheeler.

The witness Baltha Burtrago testified that she was parked in a car with her fiance near the intersection of Laurel Canyon Boulevard and Saticoy Streets on the evening of November 5, 1969. They were parked approximately 200 feet away from the gas station on the corner facing south. She was in the front seat of the car facing the gas station talking to her fiance, to whom she was subsequently married.

While she and Mr. Burtrago were sitting in the car she heard two gunshots and then two more. They came from the direction of the gas station. Looking in that direction, she saw a person shooting a gun. There was a car parked next to the gas pumps in the gas station. After shooting his gun she saw this person run to the car, get in on the driver's side and drive out the Laurel Canyon side of the gas station headed north. The vehicle went directly past Mrs. Burtrago's car and she was able to see the person who was driving. That person was appellant Billy Wheeler. The car was a light colored 1962 or 1963 Ford Galaxie.

According to Mrs. Burtrago, the police never showed her any photographs of suspects in the shooting and she never viewed a lineup. According to Mrs. Burtrago, when the vehicle left the gas station it did not have the headlights on.

The witness Mike Jensen, an employee at the pizza restaurant, testified that he was standing near a freezer in the back of the restaurant when he heard the gunshots on the evening of November 5, 1969. He ran to the front window of the restaurant where he saw a man lying on the ground and another man running in the direction of his car. The vehicle

was a Ford which had a checkered pattern across the back between the two taillights. Mr. Jensen could see the side portion of the man's face as he pivoted in the direction of his car. He identified the man as appellant Billy Wheeler. On none of the occasions during which he was asked to make an identification of the man he saw in the gas station that night did the police suggest to him that Billy Wheeler or Eugene Wheeler was a person or persons whom he should identify. Nor was Mike shown any photographs of suspects or taken to a lineup to view suspects.

The witness Gary Gersh testified that he was in his apartment across the street from the gas station on Laurel Canyon Boulevard on the evening of the shooting. Between 8:30 p.m. and 9:15 p.m. he heard what he believed to be a shotgun blast. As he made his way down to the street level of his apartment, he heard two more shots. The shots appeared to be coming from the direction of the gas station across the street. As he reached the street he observed a white or light colored Ford similar to the photographs in People's Exhibit No. 7 going northbound on Laurel Canyon with its lights off. He ran across the street where the victim was lying face down by one of the gas pumps. The man was babbling in a foreign language and also said "I'm a dead man, they killed me; I know I am dead."

Officer Barry Taylor of the Los Angeles Police Department was assigned to the North Hollywood patrol on November 5, 1969. Some time between 8 p.m. and 8:30 p.m. he received a radio call that a shooting had occurred at a Phillips 66 gas station on the corner of Laurel Canyon Boulevard and Saticoy Street in North Hollywood.

When he arrived at the scene, he observed a person lying face down on the gas station pavement bleeding from his back and his neck area. Officer Taylor found some .410 shotgun shell spent rounds, some .45 automatic shell spent rounds, and a .45 shell that appeared to have misfired. Officer Taylor and another officer picked up the shells for evidence and marked them.

While Officer Taylor was at the scene, the victim's son arrived and informed him that approximately 20 minutes earlier a Volkswagen had come into the gas station to purchase gasoline and that a dispute had arisen with the driver. The son informed Officer Taylor that his father had been shot approximately 10 minutes after the Volkswagen had left the gas station.

In talking to other witnesses at the scene of the shooting, Officer Taylor learned that two male Negroes driving a white-colored Ford were the described suspects in the shooting. The Ford was described as having a

checkerboard pattern on the rear deck and had round tail lights. The witnesses did not all agree as to the age of the Ford, some saying that it was a 1956 or 1957 Ford and others believing that it was a 1963 or 1964 Ford. They described one of the suspects as having a high natural haircut and one of them was wearing a thin leather jacket at approximately hip length with a leather belt and no buckle. Officer Taylor then put out a radio broadcast describing the vehicle and noting that two male Negroes or possibly one male and one female Negro were involved.

Officer Timothy Baker of the Los Angeles Police Department was patrolling the North Hollywood area after 8:30 p.m. on November 5, 1969, when he heard a radio broadcast concerning a shooting which had occurred at the corner of Saticoy and Laurel Canyon. The suspects were described as two male Negroes and two female Negroes or possibly one male and one female Negro driving a 1963 or 1964 white Ford which had a checkerboard pattern across the trunk.

About one-half hour after hearing the radio broadcast, Officer Baker observed a white 1963 Ford with a checkerboard pattern across the back of the trunk about half a mile from the scene of the shooting traveling northbound on Laurel Canyon Boulevard. A male and a female Negro, both having high hairdos, were riding inside the vehicle. Officer Baker displayed the red lights on his police vehicle and signaled the car over with his horn. At the time of the stop, Officer Baker believed that the occupants of the vehicle were possible shooting suspects who could be armed and dangerous. Appellant Billy Wheeler stepped from the vehicle and started backing towards Officer Baker as Officer Baker exited from his vehicle. Officer Baker told him to halt and to keep his hands where Officer Baker could see them at all times. Appellant Billy Wheeler immediately stated to Officer Baker that he had already been stopped and that the police were letting him go and that he wasn't involved in the shooting. Officer Baker had not said anything to him other than to halt. In the meantime other police units had arrived. Officer Baker gave Wheeler a cursory search for a weapon and asked him for identification. He stated that he had left his driver's license at home and did not have it with him. He produced no identification but stated that his name was Billy Wheeler. Officer Baker made a check for outstanding warrants over his radio and received information that an outstanding warrant did exist. Officer Baker arrested Billy on this traffic warrant.

Following his arrest, appellant Billy Wheeler was booked at the North Hollywood police station. At the time of the booking, Officer Baker had a teletype abstract of the warrant.

Sergeant Albert Gastaldo of the North Hollywood Detective Bureau was called to the Valley Doctors Hospital where he talked with physicians who were attending the victim of the shooting. The doctors indicated to Sergeant Gastaldo that the victim had been shot with shotgun pellets and probably a .45 caliber weapon.

At the hospital Sergeant Gastaldo talked to the victim's son who informed him that he had been at the service station with his father approximately 20 minutes prior to the shooting. He indicated that he had been called by his father to the gas station because of a dispute which arose between a male Negro and two female Negroes over the purchase of some gasoline. He gave Officer Gastaldo a description of the suspects and informed him that he had already given officers at the scene the name and license number of the persons that were involved. The victim's son indicated that he had gone home following the dispute and had received a phone call informing him of the shooting at the time he walked into the house.

The license number of the Volkswagen was checked and found to be registered to a female Negro who lived in the neighborhood of 7500 Laurel Canyon Boulevard. Officers related to Sergeant Gastaldo that police officers had gone to a large apartment complex at 7500 Laurel Canyon and did in fact observe the Volkswagen parked in the parking lot. The apartment building was less than 400 feet from the gas station in which the shooting occurred. Appellant Eugene Wheeler was taken into custody at the Laurel Canyon apartment building.

Sergeant Gastaldo received additional information from officers who were at the scene of the shooting that a 1962 to 1964 light-colored Ford had been seen to leave the scene of the shooting and that it had some kind of distinctive checkering on the back. He was also given a description of the people who were involved in the shooting. Moments later he was made aware of the fact that a person by the name of Billy Wayne Wheeler had been stopped and arrested on a traffic warrant while driving a vehicle which fit the description of the Ford. According to Sergeant Gastaldo's information, both appellants were living at the 7500 Laurel Canyon address.

Sergeant Gastaldo thereafter sent for appellant Billy Wheeler and interviewed him at the North Hollywood police station. Gastaldo's partner, Sergeant Gandre, read to appellant Billy Wheeler a statement of his constitutional rights and he indicated that he understood them. Toward the end of the conversation, the subject of searching appellant's apartment was discussed. After Billy had made some statements concerning his activities that evening, Sergeant Gastaldo asked him if he owned any guns. He stated that he did not and further said, "You can go to my apartment and

search the heck out of it and you won't find anything there, and you are liable to find a box of .32 caliber ammunition that belongs to a friend of mine and is not even mine."

At that point the conversation was terminated for approximately 10 minutes. Sergeant Gastaldo returned to the interview room along with Sergeant Gandre whereupon Billy stated to him, "Look, Man. I just want to get this thing over with. Let's go search my apartment. You can search the shit out of it. I'll even help you." Sergeant Gastaldo then called Officer Gibson into the room and told him that Billy Wheeler wanted them to search his apartment and that it was a consent search. He then looked at Billy and said, "Is that right?" Billy looked up at him and the other officers and stated, "Yeah. Let's get to it."

Thereafter, Billy Wheeler and several police officers went to his apartment at 7,500 Laurel Canyon Boulevard during the early morning hours of November 6, 1969. Because Billy had no key to open the door to his apartment, Officer Schumacher went to the manager's apartment and obtained a key from her.

Officer Schumacher returned to apartment 108 with the key and handed it to Billy. By that time the handcuffs on Billy's hands had been removed. He opened the door with the key and asked the officers to enter stating that he wanted to "get the thing over with."

Billy and four officers then entered the apartment and began searching it. Billy took part in the search, pulling drawers out of the dressers and scattering the contents on the floor and telling the officers that he would put his belongings back the next day. During the first 10 minutes of the search, the only items of evidentiary value found were a box of .32 caliber shells and a pair of trousers resembling those described as the one worn by one of the participants in the shooting.

At that point, one of the searching officers, Officer Mitchell, pulled a speaker from the wall. After pulling the speaker from the wall, Officer Mitchell looked behind the speaker into the wall. There he observed a rifle or the barrel of a pistol pointing up and also what appeared to be a sawed-off shotgun. They were hanging from a hanger that was attached to the rear of the speaker frame. Officer Mitchell pulled up the hanger and retrieved a .45 automatic pistol and a .410 sawed-off shotgun.

Barton Carlson, a police officer with the Los Angeles Police Department assigned to the North Hollywood division, arrived at the scene of the crime on the evening of November 5, in response to a radio call. At the gas station he recovered two spent .45 shell casings which were located

in the vicinity of the spot where Mike Jensen had indicated that he saw Billy Wheeler as he turned to run for his car. He found two .410 shotgun shell casings west of the north end of the gas station building and approximately in the area of the rear wheel of the vehicle in which the two suspects were seen leaving the gas station. Officer Carlson also recovered an unspent .45 shell from an area adjacent to the gas pump island on the Laurel Canyon side.

Edward Mitchell, a police officer assigned to the North Hollywood division, was one of the officers who searched appellant Billy Wheeler's apartment at 7500 Laurel Canyon Boulevard late in the evening of November 5, 1969. Officer Mitchell testified that during the course of the search, he removed a speaker from a wall in the apartment. He looked into the hole which remained and observed the barrel of a pistol and a rifle hanging inside the hole. They were hung there from a coat hanger. The .45 automatic pistol marked as People's Exhibit 5 appeared to be the pistol which was removed from inside the wall. The shotgun identified as People's Exhibit 9 appeared to be the shotgun recovered from the wall. The coat hanger identified as People's Exhibit 28 appeared to be the coat hanger from which the two firearms were suspended. In addition a box of .32 caliber ammunition and two pairs of pants were taken from the apartment. A leather jacket resembling People's Exhibit 6 was taken from the person of appellant Billy Wheeler after the search.

William Stevens, a qualified expert in the rolling, taking, and comparison of fingerprints, rolled a set of fingerprints and hand prints for appellant Eugene Wheeler. The cards were marked as People's Exhibit 18. According to Officer Stevens, a fingerprint which he lifted from the .410 gauge shotgun (People's Exhibit 9) was that of Eugene Wheeler. He could not lift any prints from the .45 automatic pistol which he could read to make a comparison for identification. The print from the shotgun was lifted on or about November 6, 1969.

DeWayne Wolfer, a qualified firearms and ballistics expert, test fired the .45 caliber automatic pistol (People's Exhibit 5) and obtained two shell casings (People's Exhibit 13). He compared these two casings with the casings obtained at the scene of the crime (People's Exhibit 11) and was of the opinion that one of the expended casings found at the scene of the crime was definitely fired from People's Exhibit 5. He could not positively determine whether or not the other expended cartridge had come from that weapon. Officer Wolfer also compared an expended projectile from his test firing with the projectile obtained from the body of the deceased (People's Exhibit 14) and was of the opinion that People's Exhibit 14 was at some time fired from People's Exhibit 5.

Officer Wolfer also test fired the .410 gauge shotgun (People's Exhibit 9) and was of the opinion after comparing the test fired casings with those obtained at the scene of the crime that the casings obtained at the scene of the crime (People's Exhibit 12) were fired from People's Exhibit 9. Officer Wolfer also viewed the gas station and identified the buckshot pattern in the cabinets on the southeast wall of the lube rack as being a pattern which would indicate the firing of a .410 gauge shotgun. He made a similar identification of a shotgun pattern in the base of a wall underneath one of the windows in the gas station. According to Officer Wolfer, the shotgun had been fired by a person standing in the general area from which Officer Carlson retrieved the expended shotgun shell casing.

The parties stipulated that Dr. Dominick Ambrosecchia performed an autopsy on the body of the decedent, Aarne Kiiha, and determined that in his opinion the cause of death was gunshot wounds to the neck and vital structures. The parties also stipulated that the entrance wounds around the right side of the right knee of the decedent were buckshot wounds and that the holes in the decedent's back were caused by bullets of the same caliber. The date of death was stipulated to be November 13, 1969.

Eugene did not take the stand. At the hearing on the motion to suppress evidence Billy took the stand and denied that he was advised of his constitutional rights or that he ever gave consent to the search of his apartment. At the trial he denied any implication in the crime and testified that he had spent the evening of November 5, 1969, until about 10 p.m. in his apartment with Jackie Hill. He testified that he did not know who had placed the .410 gauge shotgun and the .45 automatic pistol in the wall of his apartment.

### The Search of Appellant Billy Wheeler's Apartment Was Made With His Consent Freely and Voluntarily Given.

The evidence provides abundant support for the trial court's finding that appellant Billy Wheeler voluntarily consented to the search of his apartment. The fact that he was under arrest would not necessarily make his consent involuntary. (*People* v. *Smith*, 63 Cal.2d 779, 798-799 [48 Cal.Rptr. 382, 409 P.2d 222], cert. den. (1967) 388 U.S. 913 [18 L.Ed.2d 1353, 87 S.Ct. 2119]; *People* v. *Dahlke*, 257 Cal.App.2d 82, 87-88 [64 Cal.Rptr. 599].) Moreover, the fact that he volunteered the statements that the officers could search his apartment, was not asked by the officers beforehand for permission to search, and actually assisted in the search itself are factors which clearly indicate that he did not consent as a result of coercion or duress. (*Rogers* v. *United States* (10th Cir. 1966) 369 F.2d 944, 948, cert. den. *Ferguson* v. *United States* (1967) 388 U.S. 922, 18

L.Ed.2d 1371, 87 S.Ct. 2125]; *United States* v. *Tchack,* 296 F.Supp. 500, 505.) The following from our decision in *People* v. *Pranke,* 12 Cal.App.3d 935, 946 [91 Cal.Rptr. 129], is pertinent here: "One who has just been subjected to an illegal arrest may well be emotionally unable to decline the offending officer's 'request' or 'solicitation' to search his residence. However, when the roles are reversed and it is the person himself who 'requests' or 'solicits' the officer's visit and inspection of his residence, it is most difficult semantically or logically to characterize such *sua sponte* conduct as 'compelled.' As aptly observed in *People* v. *Doerr,* 266 Cal.App.2d 36, 39 [71 Cal.Rptr. 889]: 'Doerr [the defendant therein] volunteered his consent to a search of his car without the officer having asked for permission. On appeal it is argued the consent demonstrated "an innocent mind or a clever gambler." We disagree only with attributing such a clumsy bluff to a *clever* gambler. Doerr's consent was not in response to any assertion of authority and could only be deemed free and voluntary.' (Italics found in the original decision.) Appellant, like the defendant, Doerr, was indeed a gambler, albeit a crude rather than a clever one."

In addition, the fact that Billy was advised of his *Miranda* rights, while not necessary to sustain the finding of consent to search (*People* v. *Thomas,* 12 Cal.App.3d 1102, 1108-1110 [91 Cal.Rptr. 867]), was an additional factor tending to show voluntary consent. (*People* v. *Dahlke, supra,* at p. 88.) He was found driving a vehicle which matched the somewhat unique description of the one involved in the shooting at a place near the scene of the reported crime. The precautions taken by police were reasonable and were not designed to coerce Billy into letting them search his apartment. Unlike the situation in *Judd* v. *United States,* 190 F.2d 649, 650-652, in the case at bench the first person to suggest the searching of Billy's apartment was Billy himself and not one of the officers. Furthermore, he specifically stated that the officers could search, unlike the defendant in *Judd, supra,* at page 652.

Appellants contend that Billy's consent was not intelligent and therefore involuntary because he was never advised of his constitutional right to refuse consent to the search. The decisions rejecting this contention are almost too numerous to list in their entirety. (See *People* v. *Hidalgo,* 7 Cal. App.3d 525, 529 [86 Cal.Rptr. 660]; *People* v. *Bustamonte,* 270 Cal. App.2d 648, 653 [76 Cal.Rptr. 17]; *People* v. *Beal,* 268 Cal.App.2d 481, 485 [73 Cal.Rptr. 787]; *People* v. *Dahlke, supra,* 257 Cal.App.2d 82, 89; *People* v. *Roberts,* 246 Cal.App.2d 715, 729 [55 Cal.Rptr. 62]; see also, *People* v. *Superior Court,* 71 Cal.2d 265, 270, fn. 7 [78 Cal.Rptr. 210, 455 P.2d 146].)

### The Evidence Is More Than Sufficient
### to Sustain the Verdicts Against Both Appellants.

Appellants' arguments in support of their challenge to the sufficiency of the evidence are so obviously frivolous that they deserve nothing more than summary rejection. ■ Murder in the first degree is the wilful, deliberate and premeditated unlawful killing of another human being with malice aforethought. (Pen. Code, § 189.) It may be proved wholly or in part by circumstantial evidence, and a defendant's involvement in the crime may likewise be established by such evidence. (*People* v. *Teale*, 70 Cal.2d 497, 505 [75 Cal.Rptr. 172, 450 P.2d 564]; *People* v. *Robillard*, 55 Cal.2d 88, 93 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]; *People* v. *Scott*, 176 Cal.App.2d 458 [1 Cal.Rptr. 600].)

### Eugene's Self-Incriminating Statements
### Implicating Billy Were Properly Admitted.

■ Appellants contend that the trial court erred in admitting the statements by Eugene which linked Billy to the shooting because the prosecution had failed to make a prima facie showing of a conspiracy. They also argue that even if a prima facie showing was made, the statement was not in furtherance of the conspiracy. Neither of these contentions is valid.

■ The law is well established that the quantum of evidence necessary to constitute prima facie proof of a conspiracy is less than even a preponderance of the evidence. A prima facie showing is made "where the evidence and the reasonable inferences that may be drawn therefrom point to the probability of collaboration between the conspirators [citation]." (*People* v. *Black*, 216 Cal.App.2d 103, 112 [30 Cal.Rptr. 798].) ■ Furthermore, the order of proof is within the sound discretion of the trial court, and the court's decision to permit introduction of statements by conspirators before proof of the conspiracy will not be disturbed on appeal without a showing of an abuse of that discretion. (*People* v. *Brawley*, 1 Cal.3d 277, 287 [82 Cal.Rptr. 161, 461 P.2d 361]; *People* v. *Black, supra*, at pp. 111-113.)

■ Excluding Eugene's statements, the evidence and the inferences reasonably drawn therefrom clearly pointed to the practical certainty that appellants had conspired to commit the charged crime. Eugene was involved in a heated dispute with the victim. He returned to his apartment building and had a short discussion with his brother. Within minutes, he left his own apartment, and shortly thereafter the shooting occurred. Three witnesses saw Billy shoot the victim after they heard a shotgun discharge. Billy and an unidentified man left the scene. The shotgun and pistol were

found in Billy's apartment, and Eugene's fingerprint was found on the shotgun.

The unlawful agreement, which is the essence of a conspiracy, almost always must be deduced from the behavior of the alleged conspirators. The evidence in this case leaves no room for reasonable doubt that between the time of the argument and the shooting, appellants conspired to commit the crime. (See *Lorenson* v. *Superior Court,* 35 Cal.2d 49, 57-58 [216 P.2d 859]; *People* v. *Toledo-Corro,* 174 Cal.App.2d 812, 819-820 [345 P.2d 529].)

We hold that Eugene's statements were made in furtherance of the conspiracy. His statements not only disclosed that he and Billy planned to kill a man but they were plainly intended and designed to persuade the women to whom the statements were made to conceal appellants' involvement in the shooting and to cooperate by providing an alibi for them. The plan to conceal the crime by devising an alibi was an "ordinary and probable part of the common design" to shoot the victim. Eugene's statements made for the purpose of persuading the women to help conceal the crime were therefore made in furtherance of that common design. (See *People* v. *Durham,* 70 Cal.2d 171, 179-184 [74 Cal.Rptr. 262, 449 P.2d 198]; *People* v. *Kauffman,* 152 Cal. 331, 335-337 [92 P. 861].)

However, assuming for the sake of argument that Eugene's statements were improperly admitted against Billy, the assumed error in admitting them was harmless beyond a reasonable doubt. (*Chapman* v. *California,* 386 U.S. 18, 21-24 [17 L.Ed.2d 705, 709-711, 87 S.Ct. 824]; *People* v. *Brawley, supra,* 1 Cal.3d 277, 288.) Three witnesses positively identified Billy as one of the gunmen. The murder weapons were found in Billy's apartment. There was convincing evidence of a conspiracy to commit murder in which both Billy and Eugene were to participate. As noted in *People* v. *Massie,* 66 Cal.2d 899, 922-923 [59 Cal.Rptr. 733, 428 P.2d 869], a conviction will not be reversed where the appellate court is convinced that a result more favorable to the appellant would not have been obtained in a separate trial in which the statements in question were excluded. Unlike the situation in *Massie,* the evidence of Billy's guilt in the present case, without Eugene's statements, is overwhelming.

*The Trial Court Properly Instructed the Jury on the Conspiracy Theory Advanced by the Prosecution*

Appellants contend that because the prosecution did not establish a prima facie conspiracy, the trial court erred in instructing on conspiracy. For the reasons set forth above in our discussion of the preceding assignments of error, we hold that the court properly gave the instructions on conspiracy. (*People* v. *Durham, supra,* 70 Cal.2d 171, 179-181.)

*Billy Was Not Substantially Prejudiced by the Trial
Court's Failure to Grant Him a Separate Trial.*

Appellant Billy Wheeler argues that the trial court committed reversible error in denying his motion for a separate trial. For the reasons stated at length in our discussion of the admissibility of Eugene's statements incriminating both appellants, we hold that this argument lacks merit. Furthermore, even if it were assumed *arguendo* that there was error in the denial of the motion, we would hold it to be harmless beyond a reasonable doubt. We recognize, of course, that a less strict rule of harmless error is applicable here where the asserted error invokes no violation of a federal constitutional mandate. (*People* v. *Massie, supra,* 66 Cal.2d 899, 920 et seq.)

In *Massie,* a case in which the evidence was "closely balanced," the court observed as follows at pages 922-923: "We do not believe that we should reverse a conviction achieved at a joint trial in the absence of a reasonable probability that the defendant would have obtained a more favorable result at a separate trial. Although we recognize the importance of the preservation of the procedural safeguard of a separate trial, the Legislature has decreed joint trials to be the rule and separate trials the exception. The question of the erroneous denial of a severance does not rise to jurisdictional magnitude, nor is the right to a separate trial so fundamental that its denial must occasion automatic reversal. We cannot say that in every case of an improper denial of a separate trial, a joint trial is necessarily so unfair as to amount to a miscarriage of justice. We must weigh the prejudicial impact of all of the significant effects that may reasonably be assumed to have stemmed from the erroneous denial of a separate trial."

*The Fact That Pretrial Identification Procedures Were
Not Utilized Does Not Require the Exclusion of
In-Court Identifications.*

Appellant Billy Wheeler argues that his identifications by the three witnesses who testified at the preliminary hearing and at the trial were inherently unfair because the very fact that he and his brother obviously were the persons accused tainted the in-court identifications with the same suggestiveness that condemns an unfair pretrial lineup.

No authority is cited in support of this contention and appellant concedes "that a pre-trial lineup is not presently required as a prerequisite to an in-court identification." The identical contention was rejected in *People* v. *London,* 274 Cal.App.2d 241, 242-243 [78 Cal.Rptr. 848] (hg. by the Supreme Court den. August 20, 1969) with the observation that "In the case of in-court identifications not preceded by a lineup, however,

the weaknesses, if any, are directly apparent at the trial itself and can be argued to the court and jury without the necessity of depending on an attempt to picture a past lineup by words alone."

### The Tape Recording of Mischell Hutchinson's Prior Conversation With the Police Was Properly Admitted as a Prior Inconsistent Statement Under Evidence Code Section 1235.

■ Appellants contend that the trial court committed reversible error in admitting into evidence a tape-recorded conversation between Mischell Hutchinson and the police to refresh her recollection at appellants' trial. They contend that this prior statement was actually being admitted for the truth of the matter asserted and was therefore inadmissible hearsay. Our rejection of this contention is required by the decisions in *California* v. *Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930], and *People* v. *Green*, 3 Cal.3d 981 [92 Cal.Rptr. 494, 479 P.2d 998].

The factual situation in the case at bench is very similar to that presented in *People* v. *Green*. In *Green*, one of the prior statements admitted was a statement to a police officer. The witness, in *Green*, gave trial testimony which was consistent with his prior statements until he was questioned about the specific criminal acts he had previously mentioned. At this point he became very vague and equivocal, claiming he no longer remembered what had happened.

In the case at bench, Mischell Hutchinson's account of the incident at the gas station and of subsequently going to Eugene's apartment was consistent with her sister's. However, when questioned about going to Billy's apartment and about Eugene's calling the women into the bedroom of his apartment, Mischell's memory appeared to fail. In the course of her lengthy examination, she several times contradicted herself by recalling incidents which only a short time previously she professed not to remember.

The Supreme Court's characterization of the witness' testimony in *Green* is equally applicable to that of Mischell Hutchinson: "A dispassionate appraisal of the foregoing testimony, which we previously characterized as 'markedly evasive and uncooperative' [citation], leads to but one conclusion: the trial court could properly disbelieve Porter's claim that he no longer remembered . . . ." (*People* v. *Green, supra,* 3 Cal.3d 981, 987.)

### Appellants Offered No Evidence to Establish That the District Attorney Excluded Black People From Their Jury Solely Upon the Basis of Race.

■ Appellants contend that the prosecutor systematically excluded blacks from the jury on the basis of race, thereby denying them a fair trial

and equal protection of the law. There is nothing in the record to support this claim other than the assertion of counsel that five of the fourteen prospective jurors who were excluded by the prosecutor's exercise of peremptory challenges were black.

The prosecutor stated to the trial court that these five people were excluded for the same reasons that the other nine were excluded and not because of the color of their skin. Referring to the five prospective jurors named by defense counsel, the prosecutor stated: "I didn't really think that all of the names that he [defense counsel] indicated were black people, but, in his opinion, apparently they are." When the defense again raised this contention at the hearing on the motion for a new trial, the court noted the absence of any evidence to support the assertions of defense counsel or to warrant any assumption that black jurors would have returned verdicts any different from those returned by the jurors who heard the case.

There having been no showing of a deliberate intention to exclude blacks from the jury because of race, the trial court's denial of appellants' motions for a mistrial and for a new trial was not an abuse of discretion. (*People* v. *Hayes,* 276 Cal.App.2d 528, 533 [80 Cal.Rptr. 893]; *Ganz* v. *Justice Court,* 273 Cal.App.2d 612, 619-622 [78 Cal.Rptr. 348]; *People* v. *Hernandez,* 100 Cal.App.2d 136, 137 [223 P.2d 76]; cf. *People* v. *Hines,* 12 Cal.2d 535, 538 [86 P.2d 92], where the prosecution admitted engaging in the practice of systematically excluding blacks from jury venires.)

### *The Trial Court Did Not Abuse Its Discretion in Refusing to Permit Appellant Eugene Wheeler to Reopen Voir Dire Examination of Juror Number Six.*

Appellant Eugene Wheeler contends that he was deprived of a fair trial and due process of law by the trial court's refusal to permit reopening of the *voir dire* examination of one of the jurors when counsel learned that this juror had been challenged in a prior criminal case because he had indicated that he could not be impartial in that case.

During his *voir dire* examination, the trial court, the prosecutor and counsel for appellants all questioned the juror. These questions included those relating to his belief that he could be impartial. After appellants' trial had commenced and the jury had been sworn, counsel for Eugene Wheeler moved to reopen *voir dire* of the named juror for cause. Counsel read from his *voir dire* examination in another case in progress at the time of appellants' trial in which the juror had been excused. One statement made by him in the other case was to the effect that his prior dealings with law enforcement would not permit him to be impartial to *both* sides.

It should be emphasized that the juror did not indicate which side he thought he might be inclined to favor at the prior trial. While appellants seem to contend that he was clearly indicating partiality toward the People because of his contacts with law enforcement officers, he also indicated his having had experiences with them regarding his own children which apparently were not pleasant. In view of his testimony that he could be impartial in the present case, the trial court's ruling was clearly not an abuse of discretion. (*People* v. *Duncan,* 53 Cal.2d 803, 815-816 [3 Cal. Rptr. 351, 350 P.2d 103]; *People* v. *Craig,* 196 Cal. 19, 25 [235 P. 721]; *People* v. *Spear,* 32 Cal.App.2d 165, 169-170 [89 P.2d 445], cert. den. (1939) 308 U.S. 555 [84 L.Ed. 466, 60 S.Ct. 116]; *People* v. *Tomasovich,* 56 Cal.App. 520, 526-527 [206 P. 119]; see also, *People* v. *Scott,* 123 Cal. 434, 435 [56 P. 102].)

### The Third Trial of Eugene Wheeler After Two Prior Mistrials Did Not Violate the Double Jeopardy Doctrine or Constitute Cruel and Unusual Punishment.

█ Appellant Eugene Wheeler contends that placing him on trial for murder a third time following two prior mistrials constituted cruel and unusual punishment and placed him twice in jeopardy.

As to the claim of double jeopardy, the courts have repeatedly held that where a jury is discharged for failure to reach a verdict, jeopardy does not attach because the law places the parties back in status quo as if no trial had ever occurred. (*People* v. *Lovely,* 16 Cal.App.3d 196, 202 [93 Cal.Rptr. 805]; *People* v. *Demes,* 220 Cal.App.2d 423, 433-434 [33 Cal. Rptr. 896], cert. den. (1964) 377 U.S. 946 [12 L.Ed.2d 308, 84 S.Ct. 1354]; *People* v. *Westwood,* 154 Cal.App.2d 406, 409 [316 P.2d 23]; *People* v. *Crooms,* 66 Cal.App.2d 491, 499 [152 P.2d 533].) Where, as in the case at bench, the record discloses no irregularity in the discharging of the two prior juries, the courts presume the discharge to have been proper. (*People* v. *Westwood, supra,* at p. 409; *People* v. *Griffin,* 66 Cal.2d 459, 464 [58 Cal.Rptr. 107, 426 P.2d 507].)

There is no merit in the contention that the third guilt trial constituted cruel and unusual punishment. The California Supreme Court rejected this contention in a capital case where the defendant was about to undergo a fifth penalty trial following three reversals and a mistrial. (*People* v. *Terry,* 70 Cal.2d 410, 417-418 [77 Cal.Rptr. 460, 454 P.2d 36]; see also, *People* v. *Griffin,* 15 Cal.App.3d 442, 450-451 [93 Cal.Rptr. 319].)

### The Trial Court Did Not Abuse Its Discretion in Denying Billy Wheeler's Request to Have the Jury View the Scene of the Crime.

Appellant Billy Wheeler contends that the trial court's refusal to permit the jury to view the scene of the crime was an abuse of discretion, asserting that a view of the scene would have demonstrated how unlikely it was under the circumstances that the three witnesses could have identified him with the certainty that their testimony indicated. This contention must be rejected.

It is the moving party's burden to show that the trial court abused its discretion in not permitting a view. (Pen. Code, § 1119; *People* v. *Wade*, 266 Cal.App.2d 918, 925 [72 Cal.Rptr. 538], cert. den. (1969) 395 U.S. 913 [23 L.Ed.2d 226, 89 S.Ct. 1758]; *People* v. *Sampo*, 17 Cal. App. 135, 151 [118 P. 957].) The witness Baltha Burtrago not only observed Billy in the gas station, but she observed him drive by within a few feet of the car in which she was sitting when he left the station. The fact that three witnesses positively identified him strongly corroborated the evidence that the scene of the crime was well lighted and that visibility was good. Had only one witness been able to identify him, there would have been more reason for the view. However, the refusal to allow a view has been upheld even where only one witness identified the defendant and other witnesses indicated that it was difficult or impossible to recognize another defendant in the same building under similar visual conditions. (*People* v. *Howard*, 28 Cal.App. 180, 181 [151 P. 754].)

Finally, the following statement of the California Supreme Court in *People* v. *Wong Hing*, 176 Cal. 699, at page 705 [169 P. 357], is apposite: "Under this provision [Pen. Code, § 1119] the making of such order is a matter committed solely to the discretion of the court, and it is difficult to conceive of a case in which the facts would justify a reversal for an abuse of such discretion."

The judgments are affirmed.

Roth, P. J., and Fleming, J., concurred.